# EXHIBIT 1

Int. Cl.: 42

Prior U.S. Cl.: 100

**United States Patent and Trademark Office**  Reg. No. 1,414,584
Registered Oct. 21, 1986

## SERVICE MARK
### PRINCIPAL REGISTER



RODEWAY INNS INTERNATIONAL, INC. (TEXAS CORPORATION)
8585 STEMMONS FREEWAYFOUR HUNDRED SOUTH
DALLAS, TX 75247

FOR: PROVIDING MOTEL AND HOTEL SERVICES, INCLUDING RESTAURANT AND NIGHT CLUB SERVICES ASSOCIATED THEREWITH, IN CLASS 42 (U.S. CL. 100).
FIRST USE 0-0-1981; IN COMMERCE 0-0-1981.

OWNER OF U.S. REG. NOS. 817,547 AND 1,031,757.
NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "INN", APART FROM THE MARK AS SHOWN.
THE DRAWING IS LINED FOR THE COLOR BLUE, WHICH CONSTITUTES A FEATURE OF THE MARK.

SER. NO. 587,060, FILED 3-10-1986.

CRAIG D. TAYLOR, EXAMINING ATTORNEY

Int. Cl.: 42

Prior U.S. Cl.: 100

**United States Patent and Trademark Office**

Reg. No. 1,414,585
Registered Oct. 21, 1986

## SERVICE MARK
## PRINCIPAL REGISTER



RODEWAY INNS INTERNATIONAL, INC. (TEXAS CORPORATION)
8585 STEMMONS FREEWAYFOUR HUNDRED SOUTH
DALLAS, TX 75247

FOR: PROVIDING MOTEL AND HOTEL SERVICES, INCLUDING RESTAURANT AND NIGHT CLUB SERVICES ASSOCIATED THEREWITH, IN CLASS 42 (U.S. CL. 100).

FIRST USE 0-0-1981; IN COMMERCE 0-0-1981.

OWNER OF U.S. REG. NOS. 817,547 AND 1,031,757.

NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "INN", APART FROM THE MARK AS SHOWN.

SER. NO. 587,062, FILED 3-10-1986.

CRAIG D. TAYLOR, EXAMINING ATTORNEY

Int. Cl.: 42

Prior U.S. Cl.: 100

United States Patent and Trademark Office

Reg. No. 1,669,813
Registered Dec. 24, 1991

## SERVICE MARK
## PRINCIPAL REGISTER

## RODEWAY INN

RODEWAY INNS INTERNATIONAL, INC. (TEXAS CORPORATION)
10750 COLUMBIA PIKE
SILVER SPRING, MD 20901

FOR: HOTEL AND MOTEL SERVICES, IN CLASS 42 (U.S. CL. 100).
FIRST USE 12-31-1962; IN COMMERCE 12-31-1962.

OWNER OF U.S. REG. NOS. 1,414,584, 1,568,904 AND OTHERS.
NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "INN", APART FROM THE MARK AS SHOWN.

SER. NO. 74-095,335, FILED 9-10-1990.

LINDA K. MCLEOD, EXAMINING ATTORNEY

Int. Cl.: 42

Prior U.S. Cls.: 100 and 101

**United States Patent and Trademark Office**

Reg. No. 2,463,494

Registered June 26, 2001

## SERVICE MARK
## PRINCIPAL REGISTER



CHOICE HOTELS INTERNATIONAL, INC. (DELAWARE CORPORATION)
10750 COLUMBIA PIKE
SILVER SPRING, MD 20901

FOR: HOTELS AND MOTELS; MAKING HOTEL AND MOTEL RESERVATIONS FOR OTHERS, IN CLASS 42 (U.S. CLS. 100 AND 101).

FIRST USE 1-16-1997; IN COMMERCE 1-16-1997.

OWNER OF U.S. REG. NOS. 1,414,584, 1,878,156 AND OTHERS.

NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "INN & SUITES", APART FROM THE MARK AS SHOWN.

SER. NO. 75-855,783, FILED 11-23-1999.

IRA J. GOODSAID, EXAMINING ATTORNEY

Int. Cl.: 43

Prior U.S. Cls.: 100 and 101

**Reg. No. 3,020,736**

## United States Patent and Trademark Office

Registered Nov. 29, 2005

### SERVICE MARK
#### PRINCIPAL REGISTER

## RODEWAY INN & SUITES

CHOICE HOTELS INTERNATIONAL, INC. (DE-LAWARE CORPORATION)

10750 COLUMBIA PIKE

SIVER SPRING, MD 20901

FOR: HOTEL AND MOTEL SERVICES; HOTEL AND MOTEL RESERVATION SERVICES FOR OTH-ERS; ON-LINE HOTEL AND MOTEL RESERVA-TION SERVICES FOR OTHERS, IN CLASS 43 (U.S. CLS. 100 AND 101).

FIRST USE 1-16-1997; IN COMMERCE 1-16-1997.

THE MARK CONSISTS OF STANDARD CHAR-ACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT, STYLE, SIZE, OR COLOR.

OWNER OF U.S. REG. NOS. 1,414,584, 2,892,764 AND OTHERS.

NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "INN & SUITES", APART FROM THE MARK AS SHOWN.

SER. NO. 78-496,672, FILED 10-8-2004.

LINDA M. KING, EXAMINING ATTORNEY

**EXHIBIT 2**

DocuSign Envelope ID: 35901063-04F5-46B0-A786-4CA3043B5C09

04/20

**CAD92 – 0000037968**
**Rodeway Inn**

**CHOICE HOTELS INTERNATIONAL, INC.**
**FRANCHISE AGREEMENT**

**THIS AGREEMENT** ("Agreement") is made in Maryland, effective as of ___October 9, 2020___
("Effective Date"), between **Choice Hotels International, Inc**., a Delaware corporation ("we" or "us"), and
**BHANAA INVESTMENTS INC**, a **California corporation** ("you").

We and you agree as follows:

    **1.**   **Definitions.**  In addition to the terms that are defined in other parts of this Agreement, the
following terms shall have the indicated meanings:

       a. "Hotel" means the property located at **1301 N. El Camino Real, San Celmente, CA 92672**
("Location") and includes the building, land and all improvements, structures, fixtures, amenities,
equipment, furniture and related rights, privileges and properties at such Location.

       b.   "Sleeping Rooms" means the number **43**, which is and shall be the total number of rentable
sleeping rooms in the Hotel, subject to change only in accordance with Section 8, below.

       c.   "Meeting Rooms" means the total number of meeting, conference and/or banquet or similar
rooms generally available for rent in the Hotel, subject to change only in accordance with Section 8, below.

       d.   "Rentable Rooms" means the Sleeping Rooms and the Meeting Rooms, collectively.

       e.   "Designated Representative" means the person designated by you to represent you on all
matters relating to this Agreement and to receive notices under this Agreement on your behalf. Unless you
change the Designated Representative in accordance with Section 15 of this Agreement, your Designated
Representative is **Jigna D. Kumbhani** whose address is **13621 Mica Avenue, Victorville, California
92392**.

       f.   "Opening Date" means the date that you begin to rent any portion of the Rentable Rooms under
this Agreement.

       g.   "Gross Room Revenues" means all revenues from the rental, sale, use or occupancy of any of
the Rentable Rooms, for whatever purpose, including cash and credit transactions, whether or not collected
by you, and any proceeds from business interruption insurance, as required by Section 12 of this
Agreement. It does not include taxes required by law (including gross receipt taxes, property taxes, and
hotel sales taxes), revenues from telephone calls, movie rentals, vending machines, room service or food
and beverages sales.

       h. "Hotel Supplies" means all furniture, fixtures, equipment (including, without limitation, computers,
printers, telephones and facsimile machines), signs, amenities and other supplies used in the construction,
renovation, maintenance and operation of the Hotel.

       i.   "Brand Mark" means the trademark and trade name **Rodeway Inn®** and the logo designated
by us for use in association with the Hotel (including designs, stylized letters, colors and other elements
that we permit you to use at the Hotel and in advertising for the Hotel) and/or any other trademarks, trade
names, trade dress, service marks or logos (whether registered or not), or any domain name, as we may
require from time to time be used in connection with the Hotel.

1

**CAD92 – 0000037968**

j. "<u>Choice Marks</u>" means collectively all of our trademarks and trade names, including, but not limited to, the Brand Mark, the trademarks and trade names ASCEND HOTEL COLLECTION®, CAMBRIA®, COMFORT INN®, COMFORT SUITES®, CLARION®, CLARION POINTE®, QUALITY®, SLEEP INN®, MAINSTAY SUITES®, SUBURBAN EXTENDED STAY HOTEL®, ECONO LODGE®, RODEWAY INN®, WOODSPRING SUITES®, EVERHOME SUITES™ and the names of our Property Management System and Reservation System, together with all related logos, trade dress, and any other additional or substituted trademarks, trade names, service marks or logos (whether registered or not) currently owned, licensed or used by us or that we later adopt, purchase or develop.

k. "<u>Rules and Regulations</u>" means our then-current brand rules and regulations, as updated and/or modified by us in our discretion from time to time (and any supplements) and brand guidelines (including any manuals or policies that we may make available), which may contain, among other things, our standards and requirements for constructing, equipping, furnishing, supplying, operating, maintaining and marketing the Hotel. The Rules and Regulations shall apply to all hotels operating under the Brand Mark.

l. "<u>System</u>" means our then-current concepts and methods for providing hotel accommodations with a high standard of service, courtesy and cleanliness using the Choice Marks and any trade secrets and includes our Property Management System and Reservation System, our loyalty program, our business referral, gift card and credit card agreements, this Agreement, the Rules and Regulations, and those identifying brand characteristics as we may from time to time reasonably designate.

m. "<u>Other Choice Brand Hotels</u>" means hotels other than the Hotel that are authorized by us to use the Choice Marks, our System for such Choice Marks and our Intellectual Property (as defined in <u>Section 7</u>).

n. "<u>Property Management System</u>" means the then-current version of the automated system that we will license to you on a non-exclusive basis to assist you to operate and manage the Hotel and to capture all data and record all transactions entered into by you and the Hotel in connection with the operation of the Hotel, including all transactions relating to the Rentable Rooms.

o. "<u>Reservation System</u>" means the then-current methods and automated systems that we use (including our call centers and any and all related telecommunications systems, e-commerce tools and techniques, websites or mobile applications, call-forwarding or call-transfer programs and techniques or similar tools or methods used by us as modified from time to time) to take, hold, honor, and report advance reservations that are made in connection with the use of the Rentable Rooms at the Hotel and at the Other Choice Brand Hotels.

**2. <u>Grant of License</u>.** Subject to your compliance with all of your obligations under this Agreement, we grant to you a non-exclusive, limited, revocable license to use (without the right to sublicense) our System and the Brand Mark to operate the Hotel during the Term. You do not have the right to use any of the Choice Marks other than the Brand Mark in connection with the operation of the Hotel. We, for ourselves and our affiliates, retain all rights and discretion with respect to the Brand Mark and the System, including, but not limited to, those specified in <u>Section 19(b)</u>.

**3. <u>Term</u>.** The term of this Agreement ("<u>Term</u>") begins on the Effective Date and ends on the date that is 20 years after the Opening Date. You have no right or option to renew this Agreement or extend the Term.  Both you and we have the right to terminate this Agreement, with or without cause, and as a matter of right, on each anniversary of the Opening Date. You or we may only exercise such termination right by giving prior written notice to the other party, provided that you may not exercise your termination right under this <u>Section 3</u> unless you have paid all fees and charges due under this Agreement (and all related agreements, including any promissory notes or other incentive agreements, and any agreements relating to the use of our System) at the time you give us notice and at the time of the proposed termination. The written notice required by this <u>Section 3</u> shall be given at least 6 months prior to the date that the proposed termination as a matter of right would be effective. If you elect to terminate this Agreement in accordance

2

**CAD92 – 0000037968**

with this Section 3, you must continue to remain current on all fees and charges under this Agreement through the date of such termination in order for your termination to be effective. Any termination in accordance with this Section 3 will not be subject to liquidated damages as described in Section 10(d)(2).

**4.  Fees and Reports.**

a.  Affiliation Fee.  When you sign this Agreement, you will pay us an affiliation fee of **$5,000 USD** ("Affiliation Fee").  The Affiliation Fee is fully earned and non-refundable when both you and we sign this Agreement whether or not you open the Hotel.  Any monies that you have paid to us as an application fee will be credited towards the Affiliation Fee.

b.  Monthly Fees. Beginning on the Opening Date, you will pay us for each month during the Term each of the following monthly fees (collectively, "Monthly Fees"):

1.  Royalty Fee. A royalty fee 5.0% of the preceding month's Gross Room Revenues ("Royalty Fee") in consideration for the license granted to you in Section 2.

2.  System Fee. A system fee equal to 3.0% of the preceding month's Gross Room Revenues for the ongoing development, maintenance and upgrading of the Property Management System and Reservation System, and for advertising, publicity, public relations, marketing, promotional programs, website maintenance, reservations and other similar services that we will provide to you under this Agreement and for our System as further described in Section 19(h) below, as we determine in our absolute right (collectively, the "System Fee"). You acknowledge and agree that: (i) we may increase the System Fee due to cost increases attributable to inflation, increases in the costs of advertising, publicity, public relations or marketing, additional costs of implementing new or improved programs or systems, or increases in our cost of providing the Property Management or Reservation Systems or any of the other aspects of our System, so long as the increases apply to all or most of the U.S. hotels that are authorized to use the Brand Mark; (ii) we may assess additional fees and charges for various components of the System and other services (including promotional programs and use of proprietary software) as described in this Agreement and the Rules and Regulations; and (iii) we may advance monies for the purposes described herein in an amount reasonably necessary to ensure the provision of such services whether or not sufficient System Fees are then available and subsequently obtain reimbursement of such advances by utilizing future System Fees or through the fee increases described above, provided that such increases shall be limited to the amount needed to recover the previous monies advanced; and

3.  Other Fees and Commissions. Such other fees and commissions described in the Rules and Regulations which are reasonably charged by us in connection with the rights and obligations granted under this Agreement.

c.  Payments and Reports. Beginning on the Opening Date, within 5 days after the end of each calendar month during the Term, you will send us a statement on a form to be determined by us showing the Gross Room Revenues, occupancy and other related information that we request for the immediately preceding month or, in the alternative, at our election, we will gather the Gross Room Revenues, occupancy and other related information through any automated information reporting systems we establish. In the event we elect to have you send us a statement of the Gross Room Revenues, you will certify that your reports are true and accurate. If we elect to have you send us a statement of the Gross Room Revenues, and you do not send us the required reports on time, we will estimate your Gross Room Revenues for interim billing purposes, and you must pay us a late charge of 1.5% of your previous month's Monthly Fees. If we elect to gather the Gross Room Revenues through our automated reporting systems, and we are unable for whatever reason to obtain an accurate report of the Gross Room Revenues, we will estimate your Gross Room Revenues for interim billing purposes. Interim bills will be considered accurate until we receive any late monthly reports or acquire accurate information through our automated reporting systems, as appropriate. We will bill you for the Monthly Fees (and interest or other penalty, if any) due under this Agreement each month, and you will pay us those amounts by the 25th day of the same month. You agree that timely payment of the Monthly Fees and any other amounts and fees due to us is of the essence for

CAD92 – 0000037968

the purposes of this Agreement. You also agree that we may apply payments that you make in any order we determine regardless of any contrary language you may indicate. You agree that you will participate in computerized or automated information reporting programs and electronic fund transfer programs that we adopt for use by hotels that are authorized to use our System. If we adopt electronic fund transfer programs, you agree to make the necessary arrangements with your bank to participate in such programs and you agree to purchase computer hardware, computer software and related telephone or other network services reasonably required in order to properly participate in these programs.

       d.   Hotel Data. You will, in a manner and form satisfactory to us and utilizing accounting and reporting standards as reasonably required by us, prepare on a current basis (and preserve for no less than 7 years), complete and accurate records concerning Gross Room Revenues and all financial, operating, marketing and other aspects of the Hotel specified by us from time to time ("Hotel Data") and maintain an accounting system that fully and accurately reflects all financial aspects of the Hotel and its business. The Hotel Data includes all bank statements, federal tax returns, state tax returns, local occupancy tax returns, daily revenue reports, monthly and annual revenue summary reports, maid logs, guest registration folios, guest complaints, guest satisfaction survey results, and complete annual financial statements (profit and loss statements, balance sheets and cash flow statements). The Hotel Data will be maintained at the Hotel, or, if you notify us in writing, at an alternate location suitable for inspection by us. All Hotel Data must be kept separate and apart from all other data. Nothing in the foregoing shall limit us from reviewing Hotel Data that is older than 7 years or from recovering amounts owed to us from any period of time.

       e.   Financial Statements and Audit. If we request in writing, you will send us copies of the Hotel Data and financial statements certified by you as true and accurate (including a profit and loss statement, balance sheet, cash flow statement, or such other financial data or reports as we may request, in a form satisfactory to us) for the Hotel for the prior fiscal year (or other time period), and you will have the Gross Room Revenues or other monies due hereunder computed and certified as accurate by a certified public accountant. During the Term and for 7 years afterward, we and our authorized representatives will have the right to verify information required under this Agreement by requesting, receiving, inspecting, copying and auditing the Hotel Data and any and all records or documents related to the Hotel Data wherever they may be located. If any inspection or audit discloses a deficiency in any payments due hereunder, you must pay us all deficiencies plus interest at the rate indicated in Section 4(f), below. If the deficiency in any payment is willful or exceeds 5% of the correct amount, you will also immediately pay to us the entire cost of the inspection and audit, including travel, lodging, meals, salaries, professional fees and other expenses of the inspecting or auditing personnel.

       f.   Interest. You will pay us interest on all charges, costs, fees and amounts due under this Agreement but not paid on time at the rate of 1.5% per month, but not more than the maximum interest rate permitted by applicable law.

   **5.**  **Our Duties**. We will during the Term:

       a.   Rules and Regulations. Make available to you an electronic copy of the Rules and Regulations;

       b.   Quality Assurance. Administer quality assurance programs as described in the Rules and Regulations that may include periodic visits to the Hotel (by us or authorized third parties) and/or guest satisfaction surveys and guest reviews to evaluate your compliance with this Agreement and the Rules and Regulations and advise you of any defaults and on changes that you must make to the Hotel or its operations to comply with this Agreement or the Rules and Regulations;

       c.   System Services. (i) Allow you to use the Property Management System and the Reservation System; (ii) provide marketing services, such as national, international and regional advertising, promotional programs, publicity, marketing research, and other related marketing activities, that we reasonably determine are appropriate for the promotion of the Hotel, our System and the Other Choice Brand Hotels; and (iii) periodically make available to the traveling public a directory or other listing of all hotels which are in good standing and that are authorized to use our System, which may be provided in an

4

CAD92 – 0000037968

electronic format, including on the Internet, in our sole discretion. You acknowledge and agree that we may combine the services that we will provide to you in clauses (i), (ii) and (iii), above, with other hotels that are authorized to use the Brand Mark and/or our System, or other hotels that we or our affiliates operate in our sole, but reasonable, discretion. You also acknowledge and agree that we will not be obligated to permit or assist in making reservations for the Hotel for any dates following the scheduled date of expiration or termination of this Agreement, or during any period in which your rights are suspended under Section 10(c) of this Agreement; and

       d.   Consultation. Make available to you, at our discretion, additional consultation and services to assist you to construct, renovate, maintain, operate, and/or market the Hotel on the same basis as provided to other hotels that are authorized to use our System under the Brand Mark; we reserve the right to charge you reasonable fees that we may establish in advance or on a project-by-project basis for such consultation and services. Any guidance, recommendations, or advice provided to you during such consultation shall be deemed suggestions only, and the decision to follow any such guidance, recommendations, or advice will be made by you in your sole discretion.

      **6.**  **Your Duties.** You will during the Term:

       a.   Compliance with Rules and Regulations. Comply with the requirements of this Agreement and the Rules and Regulations, which you acknowledge we may modify and/or update in our sole discretion from time to time, and not disclose this Agreement or the Rules and Regulations (including any copies of the Rules and Regulations that are no longer the then-current version) to anyone except your authorized employees (or the employees of your management company, if authorized by us), or your attorneys, accountants, or lenders, or on an as-needed basis;

       b.   Good Repair; Safe and Secure. Construct, renovate, operate, furnish, maintain and advertise the Hotel according to this Agreement and the Rules and Regulations; undertake all repairs, cleaning, redecoration, repainting, and replacement of obsolete or outdated Hotel Supplies; take such other corrective action as is necessary to maintain the Hotel interior and exterior, including any parking areas and food and beverage facilities, in a clean, sound, and attractive condition and good repair at all times; and operate the Hotel in a safe and secure manner that optimizes public health and safety. You are solely responsible for determining and addressing all safety concerns relating to the condition of the Hotel and surrounding areas;

       c.   Ethical Standards; Performance. Establish and maintain a high ethical and moral standard in connection with your operation of the Hotel and not allow or sponsor any activity at the Hotel that could reasonably be determined to negatively impact the Brand Mark, the Choice Marks, our System, the Other Choice Brand Hotels or our business reputation; operate the Hotel in a professional manner that meets or exceeds the generally accepted standards of performance of leading hotel operators in the industry;

       d.   Compliance with Laws; Limited Use. Comply with all local, state, and federal laws, rules, regulations and agency orders, and obtain all required permits and licenses, applicable to you, your employees, or the construction, renovation, operation, maintenance or promotion of the Hotel (including, but not limited to, all labor and employment laws), and not permit the Hotel to be used for any purpose or activity that is unlawful or that is not contemplated by this Agreement or the Rules and Regulations;

       e.   Training. Comply with our training requirements by ensuring that you and the Hotel's general manager(s) attend (at the times required by us) our then-current training programs, including our annual national convention for hotels authorized to use the System ("Training Programs") and pay the cost of tuition, living expenses, and travel expenses associated with attendance at the Training Programs by you and the Hotel's general manager(s). You understand and agree that you will be solely responsible for training your employees in the operation of the Hotel;

       f.   Signage. Obtain and display prominently at the Hotel our approved interior and exterior signage in compliance with the Rules and Regulations, which may be modified from time to time in our sole

CAD92 – 0000037968

discretion, and maintain the signage in a clean and attractive condition, and in good working order at all times;

g.    Property Management and Reservation Systems. Use the Property Management System (and the equipment, networks, software and procedures (including hardware and software refresh requirements) that are described in the Rules and Regulations) to operate and manage the Hotel and in connection with all guest transactions (including all transactions relating to the Rentable Rooms), and use our Reservation System to accept, hold, honor and track all reservations for the Rentable Rooms. You understand and agree that your use of the Property Management System is governed by a separate agreement, as we may modify and/or update from time to time ("ChoiceAdvantage Software Terms of Use"), which ChoiceAdvantage Software Terms of Use are expressly incorporated herein by reference and made a part of this Agreement, and you agree that you will abide by such ChoiceAdvantage Software Terms of Use and pay all applicable fees described in the Rules and Regulations. You also acknowledge and agree that you and we have ownership rights in data used or generated by the Property Management System or the Reservation System;

h.    Evaluation. Allow us (or any third party authorized by us) to enter the Hotel at any reasonable time to evaluate your compliance with this Agreement, the Rules and Regulations, and any quality assurance program we administer either directly or through an authorized third party. During such visit, you will assist us (or the authorized third party) in such manner as is required for us (or the authorized third party) to conduct our evaluation and, subject to availability, provide us (or the authorized third party) with one free Sleeping Room for one night. In addition, you agree that we (or the authorized third party) may evaluate your compliance with this Agreement, the Rules and Regulations, and any quality assurance program we administer, remotely and/or through data obtained from guest satisfaction surveys or programs. You agree to take all steps necessary to correct any deficiencies identified in our evaluation within the time periods that we reasonably specify;

i.    Rate Information. Upon our request, and in the manner and format we specify, send us a written description of your Hotel and its then-current rates so that we may include this information in directories and other listings and information that we periodically make available to the public. If you do not send us changes to the information that you provide to us by the deadlines that we indicate, you will honor the rates and descriptive information on record at the time of the deadlines;

j.    Promotional Programs. Participate in and honor the terms of any loyalty, discount or promotional program and pay all applicable fees or charges associated with such programs (including any room discounts, rewards programs, frequent traveler programs, photographic or virtual tour programs or gift card programs that are applicable to the Hotel or Other Choice Brand Hotels) that we offer to the public on your behalf and any room rate quoted to any guest at the time the guest makes an advance reservation. You agree that you will take all action necessary (including the supply to us of all information and the purchase of any supplies, equipment or services) to participate in any loyalty, discount or promotional programs, and that you will grant us all necessary rights in and to any photographs, video and/or other marketing materials that we may require in order to reasonably undertake such promotional programs on behalf of the Hotel, and/or some or all of the Other Choice Brand Hotels;

k.    Travel Agent Commissions. Promptly pay all travel agent commissions and global distribution system charges due from you in connection with the Hotel whether payable by you directly or collected by us on behalf of others, and abide by the Rules and Regulations related to travel agent and global distribution system procedures;

l.    System Referrals. Use your best efforts to maximize and increase the business of the Hotel, and if you are unable to accommodate a potential guest, refer the guest to Other Choice Brand Hotels that are near to the Hotel, if any;

m.    ADA Certification. Ensure that the Hotel complies with the requirements of the Americans with Disabilities Act ("ADA"). Prior to the Opening Date, you will provide to us a certification from your architect,

6

**CAD92 – 0000037968**

your general contractor, a consulting architect or you, on a form satisfactory to us, certifying that the Hotel is in compliance with all applicable provisions of the ADA. The Hotel may not open, use the Brand Mark or our System until this certification is properly completed and delivered to us;

n.    Franchise Association. Join and maintain membership in a franchise association designated by us for hotels that are authorized to use the Brand Mark ("Franchise Association"), and pay monthly Franchise Association dues to us (or our designee) in an amount we reasonably require. You acknowledge and agree that the purpose of any Franchise Association created, sponsored, or endorsed by us will be to, among other things: affect a high-level relationship among all franchisees, and between individual franchisees and us, for the purpose of mutual advantage and cooperation; improve and encourage a high performance level and cooperative action among all franchisees; advance new ideas, discuss System-wide issues and focus attention on various matters as they relate to a significant number of franchisees; encourage an exchange of operational and promotional ideas; and make appropriate recommendations to us to assure that our plans and policies enhance our mutual interests. However, you acknowledge and agree that we are not required to obtain the consent of any Franchise Association on these or any other matters;

o.    Renovations. Undertake, at our written request, remodeling, renovations, and modifications to existing improvements, necessary to modernize and conform the Hotel to the Rules and Regulations or other requirements of our System ("Renovations") and sign a property improvement plan or other writing that we prepare to document your obligation to complete such Renovations. Within 90 days after receipt of our written request that your Hotel undergo Renovations, you will submit to us for our review and approval, complete and professional drawings and plans for such Renovations before beginning any work to complete the Renovations. You will complete the required Renovations within the time reasonably specified by us in our written request. You acknowledge and agree that the obligations described in this Section 6(o) are in addition to your ongoing obligations to comply with Section 6(b) and Section 6(d);

p.    Identifying Information. Send us, before the Opening Date (and any time there is a change in any of the information), the following, as appropriate: (i) the legal name and business type (corporation, limited liability company, limited partnership, etc.) of the Hotel's operating entity; (ii) its federal TIN (taxpayer identifying number); (iii) its state income tax account number(s); (iv) its state payroll tax (withholding and unemployment tax) account number(s); (v) its state sales tax and occupancy tax account number(s); and (vi) its local (county and city) occupancy tax account number(s);

q.    Guest Complaints. Participate in, and pay all charges in connection with all required guest complaint resolution programs and ratings and review policies, which we may modify from time to time, as specified in the Rules and Regulations;

r.    Construction and Substantial Renovation Related Duties. If the Hotel has yet to be constructed or if the Hotel is to be Substantially Renovated (as defined below):

1.    Plans. Ensure that your preliminary drawings and designs for the Hotel satisfy the Rules and Regulations and the then-current prototype design specifications for hotels that are authorized to use the Brand Mark and provide a copy of your preliminary drawings and designs to us for our review and approval at least **6 months** before Construction Start, and final working drawings and final architectural designs for the Hotel ("Plans") to us for our review at least **3 months** before Construction Start. "Construction Start" means the date that bona fide pouring of footings for the Hotel begins at the Location in the case of a hotel to be constructed or the date that renovations begin in the case of an existing hotel that is to be Substantially Renovated. "Substantially Renovated" means the existing building is to be re-constructed on the interior in all areas (public spaces, guestrooms, and bathrooms) down to the concrete or stud walls (or drywall, if in good condition), including replacement of all (or substantially all) floors and ceilings. We agree to provide you with written notice of our review and determination of the Plans within 15 business days after the date we have received the Plans and agree that if we fail to provide you notice in accordance with this Section 6(r)(1), the Plans are deemed to be approved by us. If Construction Start does not commence within 6 months of our written approval of your final architectural designs for the hotel (or

CAD92 – 0000037968

within 6 months of automatic approval if we fail to provide you notice within fifteen business days in accordance with this Section 6(r)(1)), then you must resubmit final architectural designs for approval at least 60 days prior to Construction Start;

2. Timing and Extensions. Cause Construction Start to occur within **12 months** of the Effective Date, and within 5 days after Construction Start, inform us in writing that Construction Start has occurred. If you do not cause Construction Start to occur within 12 months of the Effective Date of this Agreement, you may request, before the end of the 12 months, an additional 3 months for Construction Start. We are not obligated to extend the time for Construction Start. If we agree to extend the time for Construction Start beyond the original 12 month requirement, you will pay us an extension fee of $5,000 for each 3-month extension that we grant to you;

3. Completion. Continue Hotel construction (or renovation) in accordance with the Plans, after Construction Start, without unreasonable interruption, until the Hotel is ready for our inspection. You must complete Hotel construction (or renovation), including furnishing, equipping, and preparing for opening, by the Opening Deadline (as defined in Section 6(s)(6)); and

4. Progress Reports. Send us, when we request during construction (or renovation), reports showing the progress made toward completing Hotel construction (or renovation).

s.    Opening. Prior to the Opening Date:

1.    Use of Brand Mark. Use the Brand Mark only as permitted in Section 7(c) of this Agreement;

2.    Cooperation/Inspection. Cooperate with us, and require your architect, engineer, contractors and subcontractors to cooperate with us, and allow us to inspect the Location and the Hotel to determine whether construction (or renovation) satisfies the Rules and Regulations, the then-current prototype design specifications for hotels that are authorized to use the Brand Mark, and the Plans and/or the property improvement plan set forth in Attachment A (if applicable);

3.    Hotel Supplies. Order, purchase and/or lease and install all Hotel Supplies, related equipment, supplies and other required items to operate the Hotel;

4.    Advertising. Advertise the Hotel locally, at your expense and in a manner meeting our specifications; and

5. Opening Authorization. Notify us in writing at least 30 days before the Opening Date so that we can inspect, and if we reasonably determine it to be appropriate, authorize you to begin operating the Hotel under the Brand Mark and this Agreement. You will not begin operation of the Hotel using the Brand Mark or our System until you have received our specific written authorization to do so; and

6. Opening Deadline.  Ensure that the Opening Date occurs within **12 months** after Construction Start (if the Hotel has yet to be constructed or if the Hotel is to be Substantially Renovated), or the BES Deadline (if set forth in Attachment A) ("Opening Deadline").

t.    Sources of Products and Services. Ensure that all products and services sold or offered for sale at the Hotel, and other products, materials, supplies, paper goods, fixtures, furnishings and equipment used at the Hotel, meet our standards and specifications. You must also purchase all products and services that we designate in the Rules and Regulations solely from suppliers (including manufacturers, distributors and other sources) approved by us (collectively, "Qualified Vendors"), which demonstrate, to our continuing reasonable satisfaction, the ability to meet our standards and specifications, who possess adequate quality controls and capacity to supply your needs promptly and reliably, and who have been approved by us in writing. We reserve the right to require you to purchase any or all approved products or services solely from us or our designated affiliate. We also reserve the right to receive a rebate or other benefit from Qualified

8

CAD92 – 0000037968

Vendors based on purchases by you and other franchisees. We may limit the number of Qualified Vendors to obtain volume discounts and to promote consistent quality and adequate supplies for the brand. If you desire to purchase designated products or services from a party other than a Qualified Vendor, you must submit to us a written request to approve the proposed supplier, together with such information as we may reasonably require. Among the criteria that we consider is the financial stability of the supplier, whether the product or service meets our standards and specifications, and whether the product or service is of use to our franchisees. Our complete written criteria are available for review upon your request. Where applicable, the proposed supplier must submit product samples and specifications to us. We will use our best efforts to notify the proposed supplier within 90 days after we receive all required information and samples, although a longer period may be required for certain products or services due to their cost or importance to the brand or their financial impact on our franchisees. We may revoke our approval of particular products or Qualified Vendors when we determine, in our sole discretion, that such products or suppliers no longer meet our standards or specifications.

u.    Confidential Information.    Maintain the absolute confidentiality of the Confidential Information (as defined below) during and after the term of this Agreement.  You agree that you: (i) will not use the Confidential Information in any capacity or business or purpose other than what is explicitly authorized under the terms of this Agreement; (ii) will not make unauthorized copies of any Confidential Information disclosed in written form; (iii) will adopt and implement all reasonable procedures we direct to prevent unauthorized use or disclosure of the Confidential Information. You shall divulge such Confidential Information only to such of your employees, attorneys, accountants, agents, lenders, or prospective purchasers of the Hotel as must have access to it in order to operate, loan money in connection with, or purchase the Hotel. "Confidential Information" includes the methods, techniques, formats, marketing and promotional techniques and procedures, specifications, information, Rules and Regulations, systems, costs and financial information that we communicate to you or that you otherwise acquire in operating the Hotel under the System.  Confidential Information does not include information, processes or techniques that are generally known to the public, other than through disclosure (whether deliberate or inadvertent) by you.

**7.    Intellectual Property.**

a.    No Ownership Rights. You acknowledge and agree that except as expressly permitted by this Agreement or any ChoiceAdvantage Software Terms of Use, you do not have any right, title or interest in and to the Brand Mark or the Choice Marks, Rules and Regulations, System, our then current concept and method for providing hotel accommodations using any of the Choice Marks, Property Management System, Reservation System, trade secrets or business methods (collectively "Intellectual Property") and you will not contest our rights in and to such Intellectual Property or to current or future derivations of or improvements made to the Intellectual Property, nor our right to register our rights in the Intellectual Property or to grant to others the right to use the Intellectual Property or any other intellectual property that we own. You understand that the Intellectual Property will remain our property, and that your use of any portion of the Intellectual Property inures to our benefit. You also agree that you will not sub-license the Intellectual Property rights we have granted to you under this Agreement, to any other person or entity and you will not use such Intellectual Property for any purpose other than in connection with the Hotel in accordance with the terms of this Agreement. You agree to assign and you do hereby assign any and all rights you or any other party working on your behalf may have or develop in the Intellectual Property at no cost to us. You acknowledge and agree that all rights to our Intellectual Property that have not been granted to you in this Agreement will remain ours.

b.    Limited Use; Web Sites. You acknowledge and agree that you will not include the Brand Mark (or any other Choice Marks), any words that constitute a portion of the Brand Mark (or any other Choice Marks), words that describe the Brand Mark (or any other Choice Marks), any portion of the names of our Property Management System or Reservation System, or anything confusingly similar to these marks or words ("Choice-Related Words") in your name or the name of any of your affiliates, whether a partnership, corporation, limited liability company, joint venture or any other type of business organization. You will not establish, or operate a previously established web site on the internet (or on any other network, wireless or otherwise) using any domain name (or other identifying characteristics) that contains any of the Choice-

9

CAD92 – 0000037968

Related Words, or any other portion of our Intellectual Property or anything similar to our Intellectual Property or which does not comply with our then-current domain name policy or our property website guidelines, internet distribution policy, or such similar policies or regulations adopted by us from time to time and made available to you. You acknowledge and agree that the restrictions on your use of the Choice-Related Words will survive the expiration or earlier termination of this Agreement and that we retain the right to pre-approve your use of linking and framing between your internet (or other network) web pages and all other web sites. We have the right to determine the content and use of online or electronic media associated with any of the Choice Marks. You may not participate in any website or other electronic media (including social media) that markets goods and services under the Choice Marks unless it is first approved in writing by us.

c.    Limited Use of Brand Mark. After the Effective Date but before the Opening Date, you may make the following limited use of the Brand Mark:

1.    Temporary Signs. No earlier than 90 days prior to the Opening Date, use the Brand Mark on a temporary sign, meeting our standards, at the Location advising the general public that a hotel authorized to use the Brand Mark is under construction;

2.    Local Media. No earlier than 90 days prior to the Opening Date, use the Brand Mark to promote the Hotel construction and opening in the local media;

3.    Supplies. No earlier than 90 days prior to the Opening Date, purchase operating supplies and equipment bearing the Brand Mark required for Hotel operation; and

4.    Permanent Signs. No earlier than 30 days before the Opening Date and only with our written consent, install permanent Hotel signs meeting our standards bearing the Brand Mark and the designated logo.

d.    Permitted Registration. If you are required by law to register any of our Intellectual Property, your registration application must specify that you will use our Intellectual Property: (i) only at the Hotel and in advertising for the Hotel; (ii) only during the Term; and (iii) without claiming any rights in and to the Intellectual Property during or after the Term.

e.    Notice of Suit; Injunctive Relief; Survival. You will promptly notify us of any suit filed or demand made against you challenging the validity of our Intellectual Property ("IP Claim"). Following the receipt of such notice from you and using our attorneys, we agree to defend you against any IP Claim, and to defend and indemnify you against your loss, cost or expense related to such IP Claim, except where such IP Claim arose because you used our Intellectual Property in violation of our domain name policy, property website guidelines, internet distribution policy, this Agreement, the ChoiceAdvantage Software Terms of Use, or the Rules and Regulations. You will not settle or compromise any IP Claim without our prior written consent, and you agree to cooperate with us in defending against any such IP Claim. In connection with such IP Claim, you acknowledge and agree that if at any time during the Term you do not immediately discontinue the use of our Intellectual Property (including the Brand Mark) or the Choice-Related Words following our notice to you to discontinue such use, we will seek injunctive and equitable relief for your infringement (or use of the Choice-Related Words) and, in that event, you waive, to the maximum extent permitted by law, any requirement for any bond for the issuance of any injunction, and if a bond is required, you agree that it will not exceed $1,000. The provisions of this Section 7 will survive the expiration or earlier termination of this Agreement.

f.    Changes to Brand Mark.  You agree and acknowledge that we have the right, in our sole discretion, to modify, add to, or discontinue use of the Brand Mark, or to substitute different proprietary marks, for use in identifying the System and/or the Hotel.  You shall promptly comply with such changes, revisions and/or substitutions, and bear all the costs of modifying your interior and exterior signage, advertising materials, interior graphics and any other items which bear the Brand Mark to conform therewith.

10

8.    **Change in Sleeping Room Count**. You may change the Sleeping Rooms by 5% or less by constructing additional (or removing) Sleeping Rooms, but only after providing prior written notice to us. If you wish to change the Sleeping Rooms by more than 5% by constructing additional (or removing) Sleeping Rooms or if you wish to make substantial alterations to the Hotel, you may not do so without our prior written consent, which may be conditioned on, among other things, our inspection of the Hotel and the applicable rooms. If we consent to your expansion of the Hotel or to substantial alterations to the Hotel, you must send us your construction plans and pay us an expansion fee for each addition to the number of Sleeping Rooms equal to the then-current per-room charge for hotels that are permitted to use the Brand Mark, but the expansion fee will be not less than $1,000. We will add any additional Sleeping Rooms or Meeting Rooms that you construct to the Rentable Rooms (or delete any Sleeping Rooms or Meeting Rooms that you remove from the Rentable Rooms), and you will include revenues from the additional Sleeping Rooms and any additional Meeting Rooms to calculate the Gross Room Revenues for determining the Monthly Fees due under this Agreement.

9.    **Assignment**.

a.    <u>Our Assignment</u>. We may sell or assign all or part of our rights or obligations under this Agreement to any person or legal entity. Any such sale or assignment will inure to the benefit of any assignee or other successor.

b.    <u>Your Assignment</u>. Your rights and duties under this Agreement are personal to you. We entered into this Agreement and granted the rights outlined in this Agreement to you in reliance on the business skill, financial capacity and personal character of you and your principal owners. You may not sell, assign, transfer, lease, or otherwise encumber any direct or indirect interest that you have in the Hotel, in you, or in any rights or obligations under this Agreement without giving us at least 15 days' prior written notice and obtaining our prior written consent, which will not be unreasonably withheld or delayed. Furthermore, if a Controlling Interest (as defined in <u>Section 9(d)</u>) of the originally approved ownership of the Hotel is being transferred or if you are conveying the Hotel or 50% or more of the undivided interest in the Hotel, you and the transferee must comply with all reasonable conditions we require before we will approve of such transfer, including, but not limited to, (i) the transferee signing our then-current form of the franchise agreement for hotels that are authorized to use the Brand Mark, (ii) the transferee signing a property improvement plan or other writing that we prepare to document the transferee's obligations to complete required Renovations (as defined in <u>Section 6(o)</u>), (iii) all of transferee's owners signing our then-current form of personal guaranty agreement, and (iv) payment of a re-licensing fee equal to the then-current affiliation fee we charge for new franchisees authorized to use the Brand Mark. We reserve the right to withhold our consent to any transfer if the Hotel fails to comply with our then-current brand image and standards or the transferee fails to demonstrate to our satisfaction that it meets our educational, managerial and business standards, possesses a good moral character, business reputation and credit rating, has the experience, aptitude and ability to operate the Hotel, and has adequate financial resources and capital to operate the Hotel. So long as you promptly provide us with written notice, our consent is not required for the following: (1) a mortgage, deed of trust or other encumbrance, pledge or other grant of security interest in any direct or indirect interests in you or the Hotel to a third party lender or third party preferred equity provider; or (2) the sale, assignment or transfer by you of securities in a publicly-traded corporation or entity that individually, or in the aggregate with other sales or transfers by you, constitute the sale or transfer of less than 5% of the outstanding capital stock or other equity interests in you or the Hotel.   If you assign or transfer the Hotel or any rights granted to you or your obligations under this Agreement without our written consent, you breach this Agreement and we may terminate this Agreement pursuant to <u>Section 10(b)(2)(d)</u>.

c.    <u>Transfer due to Death or Mental Incompetence; Transfer to Close Family Member</u>. If you, or any natural person with an ownership interest in you, dies or becomes mentally incompetent, the executor, administrator, or personal representative of that person must transfer that person's ownership interest in you or the Hotel (within 12 months after death or determination of mental incompetence) to one or more of the remaining persons in your entity (if applicable) or to heirs of the deceased person that we approve. If you wish to transfer your ownership interest in the Hotel to a close adult family member (such as a current spouse, parent, child, sibling, grandchild or grandparent) ("<u>Close Family Member</u>"), that Close Family

11

CAD92 – 0000037968

Member must demonstrate to us that he or she has both the financial ability and experience necessary to operate the Hotel as required by Section 9(b) before we will approve a transfer. No additional fees will be payable for any transfers of an ownership interest in the Hotel due to death or determination of mental incompetence. However, if you wish to transfer your ownership interest in the Hotel to a Close Family Member, an application fee (not to exceed $7,500) will be due to us, which will be fully refundable if we do not approve the transfer. Our approvals under this Section 9(c) will not be unreasonably withheld or delayed.

d. Controlling Interest. For purposes of this Agreement, "Controlling Interest" includes your interest if you are an individual and you own 50% or more ownership interest in the Hotel, any general partner's interest in a partnership entity, 50% or more of the voting stock of a corporate entity, 50% or more of the ownership interests in a limited liability company, or a 50% or more undivided interest in the Hotel.

**10. Default and Termination.**

a. Termination By You. If we default in our material obligations under this Agreement, you may terminate this Agreement only if you first give us written notice of the defaults and of your intention to terminate this Agreement and we have not cured those defaults within 60 days after receiving your written notice. With regard to any defaults which are not reasonably capable of being cured within 60 days, the cure period shall be extended for a reasonable additional period of time provided that we have promptly commenced to cure or cause to be cured such default, and thereafter we diligently pursue our efforts in that regard.

b. Termination By Us.

1. Termination with Notice and Opportunity to Cure. If you default in your material obligations under this Agreement, we may terminate this Agreement, effective on the date stated in our notice (or the earliest date permitted by applicable law) as follows:

(a) Non-Payment of Fees. If you do not pay us the Monthly Fees or any other fees, charges and amounts due under this Agreement (including travel agent commissions and global distribution system fees) or file required monthly reports of Gross Room Revenues, within 10 days of our written notice of default to you; or

(b) Other Breach. If you do not cure fully any other breach of your obligations or warranties under this Agreement, within 30 days of our written notice of default to you (or such longer period we designate in our sole discretion).

(c) Cure Periods. You acknowledge and agree that we may, in our sole discretion, extend the time period for you to cure any default but are under no obligation to do so, and any such extension shall not constitute a waiver of the cure periods set forth in this Agreement.

2. Immediate Termination Effective on Notice. Upon written notice to you, we may terminate this Agreement immediately, without giving you an opportunity to cure the default, if:

(a) Imminent Threat. There is an imminent threat or danger to public health or the safety of persons or property resulting from the construction, renovation, maintenance, or operation of your Hotel;

(b) Abandonment; Loss of Possession; Failure to Open. Subject to Section 14 of this Agreement, you stop operating the Hotel using the Brand Mark or according to the requirements of our System or this Agreement for any period of time, you abandon the Hotel, you temporarily or permanently lose the right to possess the Hotel (including, without limitation, due to the appointment of a Receiver or an event of condemnation), you lose the right to operate the Hotel, you fail to open the Hotel using the Brand Mark or in accordance with this Agreement, or you lose the right to transact business in the jurisdiction in which the Hotel is located;

12

**CAD92 – 0000037968**

(c) <u>Criminal Behavior</u>. You (or a beneficial owner of you) are charged with or plead guilty to a felony, a fraud, a crime involving moral turpitude or any other crime or offense that we reasonably believe is likely to have an adverse effect on the Brand Mark, the Choice Marks, our System, the Other Choice Brand Hotels, our business, our goodwill, our Intellectual Property, or our interest in this Agreement or any other instrument or agreement that we may have entered with you;

(d) <u>Transfer</u>. You (or a beneficial owner of you) transfer or purport to transfer any rights or obligations under this Agreement, any Controlling Interest in you, your interest in the Hotel, or a Controlling Interest in the Hotel without our prior written consent, except as otherwise permitted under <u>Section 9(b) or 9(c)</u> hereof;

(e) <u>False Records</u>. You maintain false books or records, send us false reports, or make any materially false statement in your franchise application or any other document you are required to submit to us;

(f) <u>Bankruptcy</u>. You file a petition in bankruptcy, become insolvent, make a general assignment for the benefit of creditors, or are unable to pay your debts to creditors on a timely basis;

(g) <u>Insurance</u>. You do not buy, maintain or send us evidence of insurance as required by this Agreement, or if we opt to procure, on your behalf, insurance required by this Agreement and you fail to reimburse us as we require under <u>Section 12(f)</u>;

(h) <u>Multiple Defaults</u>. We send you 2 or more written notices of default under this Agreement for the same or a similar cause or reason in any consecutive 12 month period during the Term, whether or not cured;

(i) <u>Construction</u>. You do not (i) begin construction or renovation of the Hotel on or before the date required by <u>Section 6(r)(2)</u> of this Agreement, (ii) submit Plans to us for our approval prior to Construction Start, and in accordance with <u>Section 6(r)(1),</u> or (iii) once begun, continue, without unreasonable interruptions, the construction or renovation of the Hotel;

(j) <u>Opening Deadline</u>. You fail to open the Hotel by the Opening Deadline in accordance with <u>Section 6(s)(6)</u>;

(k) <u>Property Improvement Deadline</u>. You fail to complete required improvements and/or repairs to upgrade the Hotel by the deadline(s) set forth in a property improvement plan;

(l) <u>Goodwill</u>.  You engage in conduct that impairs the image, identity, value or goodwill associated with the Brand Mark (or any other Choice Marks) or the System;

(m) <u>Confidential Information</u>. You make a material unauthorized disclosure of Confidential Information; or

(n) <u>Other Agreements</u>. You or your affiliate (or a beneficial owner of you or your affiliate) materially breaches any other instrument or agreement with us or our affiliates, or any mortgage, deed of trust or lease covering the Hotel, unless cured within any applicable notice or grace periods contained in such document.

c.    <u>Suspension of Franchise Rights</u>. If you breach any material obligation required by this Agreement or are in default hereunder, we may, after 10 days from our written notice of default (or longer time required by law) for financial defaults, or after 30 days from our written notice of default (or longer time required by law) for non-financial defaults, or immediately in the case of a breach under <u>Section 10(b)(2)</u>, above: (i) suspend any or all services that we (or our authorized representative) provide to you in connection with our System including your access to our Central Reservations System; or (ii) suspend your right to use

13

our Intellectual Property. In addition, while the default remains uncured, you will have no rights under the Impact Policy or the Fair Franchising Policy (as defined in Section 19(b)). In our sole discretion, we may reinstate the suspended System services or the right to use our Intellectual Property if you cure your default before this Agreement terminates and pay us the then-current reinstatement fee (as established in the Rules and Regulations). If we suspend System services or your right to use our Intellectual Property, we may use other remedies, including termination of this Agreement, after the appropriate time to cure, if any, has lapsed.

      d.   <u>Our Remedies</u>.

      1.   <u>No System Services</u>. If this Agreement expires or is terminated, we will cease to provide you with any services in connection with our System, which will include removal of the Hotel from any directories, websites, and other distribution channels, cessation of promotion programs and advertising, and cessation of your right to use our Intellectual Property. In addition, we may notify guests holding reservations that the Hotel is no longer authorized to use the Brand Mark, use our Intellectual Property or receive services in connection with our System, and we may relocate such guests upon their request.

      2.   <u>Liquidated Damages – Post-Opening Termination</u>. If we terminate this Agreement due to your default after the Opening Date, you will pay us, within 30 days after termination, as liquidated damages and not as a penalty for the premature termination of this Agreement, an amount equal to the product of (i) the average monthly Gross Room Revenues during the prior 12 full calendar months (or such shorter time that the Hotel has been open), multiplied by (ii) the maximum Royalty Fee payable under Section 4(b)(1), multiplied by (iii) the number of months (including partial months, which will be prorated) between the date of termination and the next date that you could have terminated this Agreement under Section 3, not to exceed 36 months. However, the product of (i) multiplied by (ii) will not be less than the product of $25.00 multiplied by the number of contractually approved Sleeping Rooms.

      3.   <u>Liquidated Damages – Pre-Opening Termination</u>. If we terminate this Agreement due to your default prior to the Opening Date, you will pay us, within 30 days after the termination, as liquidated damages and not as a penalty for the premature termination of this Agreement, an amount equal to the product of (i) the number of contractually approved Sleeping Rooms, multiplied by (ii) $25.00, multiplied by (iii) the fewest number of months after the Opening Date that you would have been permitted to terminate this Agreement under Section 3, not to exceed 36 months.

      4.   <u>Reasonable Estimate</u>. You acknowledge and agree that the injury to us caused by your breach of this Agreement and its termination is difficult or impossible to accurately estimate, and that the methods of calculating liquidated damages in Sections 10(d)(2), 10(d)(3), and 11(a) are reasonable estimates of our probable loss resulting from your breach of this Agreement and its termination. Payment of liquidated damages by you does not affect your obligation to pay us all Monthly Fees and other fees and amounts due to us that accrued before the termination of this Agreement, nor does it affect your continuing indemnification obligations pursuant to Section 13 of this Agreement.

      5.   <u>Discounted Liquidated Damages</u>. We will reduce the amount of liquidated damages payable to us under this Section 10(d) by 20% (the "<u>Discounted Liquidated Damages Amount</u>") if, within 15 days of termination of this Agreement, you (i) discontinue all use of our Intellectual Property (including the Brand Mark and Choice-Related Words), (ii) pay all outstanding fees and charges due under this Agreement and any other franchise agreement between Choice and you or your affiliate, and (iii) pay the Discounted Liquidated Damages Amount to us by certified or cashier's check. Notwithstanding the foregoing, if we terminate this Agreement pursuant to Section 10(b)(2)(b) because you abandon the Hotel or stop operating the Hotel using the Brand Mark or according to the requirements of our System or this Agreement, we will reduce the amount of liquidated damages payable to us under this Section 10(d) by only 5%, provided that you comply with (i) through (iii) above.

      e.   <u>Evidence of Breach</u>. If the validity of the termination of this Agreement is disputed, we may introduce evidence of a breach of this Agreement or evidence of any claim associated with the Hotel,

14

including any facilities that are managed by others at the Hotel, whether or not stated in the default or termination notice.

**11. Obligations on Termination.** On termination or expiration of this Agreement for any reason, you must, at your expense:

a. <u>Intellectual Property</u>. Immediately discontinue all use of our Intellectual Property, refrain from using the Brand Mark to identify the Hotel and cease to use the Choice-Related Words. If you do not immediately discontinue use of our Intellectual Property (including the Brand Mark) or use of the Choice-Related Words following the expiration or termination of this Agreement, you will pay us as liquidated damages and not as a penalty, the sum of $2,500 for each day following the termination of this Agreement that you continue to use our Intellectual Property (including the Brand Mark) or the Choice-Related Words, and we will have the right to seek injunctive and equitable relief for your infringement (or use of the Choice-Related Words) and, in that event, you waive, to the maximum extent permitted by law, any requirement for any bond for the issuance of any injunction, and if a bond is required, you agree that it will not exceed $1,000;

b. <u>Registration</u>. Cancel any assumed name or similar registration containing our Intellectual Property (including the Brand Mark) or any variation or portion of our Intellectual Property (including the Brand Mark) or the Choice-Related Words, discontinue all use of any web sites or other electronic media (including social media) that markets goods and services under the Choice Marks and furnish us with reasonable evidence showing that you complied with these obligations within 30 days after termination or expiration of this Agreement;

c. <u>Payment</u>. Promptly pay all sums owed to us and our subsidiaries or affiliates, and all damages, costs, and expenses, including reasonable attorneys' fees, that we incur, either before or following the termination of this Agreement, as a result of your default, including all outstanding Monthly Fees, any liquidated damages due under this Agreement, and any costs and expenses we incur to obtain injunctive relief for the enforcement of any portion of this Agreement; and

d. <u>Return or Destroy Materials</u>. Immediately return to us, or at our option, destroy all originals and copies of any materials that we have provided to you relating to our System and your operation of the Hotel, including all copies of any manuals, the Rules and Regulations and any data stored in or generated by our Property Management System and Reservation System. Except for your copy of this Agreement and other documents that you reasonably need to comply with applicable laws, you may not retain any material that we provided to you during the Term.

**12. Insurance.**

a. <u>Pre-Opening Coverage</u>. You must purchase by Construction Start and maintain until the Opening Date, at your expense, directly or through your general contractor, the types and amounts of insurance coverage as we may require in the Rules and Regulations or otherwise in writing, including, but not limited to:

1. <u>General Liability</u>. Commercial General Liability Insurance (including automobile liability, bodily injury and property damage) protecting you and naming us and our affiliates and subsidiaries, our and their respective officers, directors, agents and employees as Additional Insureds (as defined in Section 12(c)) from and against all types of liabilities, including personal injury and property damage, together with the costs of defense and/or adjustments arising out of the operations to construct or renovate the Hotel. The insurance must include coverage for contractual liability, explosion, collapse and underground property damage hazard liability, personal injury liability, products and completed operations liability, owner's and contractor's protective liability, and independent contractor's liability and must be accompanied by waivers of subrogation in our favor and the favor of our affiliates and subsidiaries, the officers, directors, agents and employers of us, our affiliates and subsidiaries.

CAD92 – 0000037968

2.    <u>Builder's Risk</u>. All-risk builder's risk coverage to insure the Hotel buildings under construction or renovation to 100% of their replacement cost value, protecting you, us and the Additional Insureds, and a workers' compensation policy as required by statute.

b.    <u>Post-Opening Coverage</u>. Beginning no later than the Opening Date and for the rest of the Term, you must purchase and maintain, at your expense, the types and amounts of insurance coverage as we may require in the Rules and Regulations or otherwise in writing, including, but not limited to:

1.    <u>Physical Damage Coverage</u>. All-risk physical damage coverage, insuring the Hotel and its contents for its full replacement cost. If the Hotel is damaged or destroyed, and unless a mortgagee requires otherwise, the proceeds of any insurance will be used to repair or restore the Hotel in accordance with your plans that we approve. Your insurance must contain a waiver of subrogation in our favor and the favor of our affiliates and subsidiaries, the officers, directors, agents and employees of us, our affiliates and subsidiaries.

2.    <u>General Liability; Automobile</u>. Commercial Automobile and Commercial General Liability Insurance policies written on an occurrence form protecting you and the Additional Insureds (as defined in <u>Section 12(c)</u>) from and against all manner of liability. The coverage described in the preceding sentence is primary to any coverage that we maintain and must include Contractual, Products and Completed Operations, Independent Contractors, Personal Injury, Property Damage, Bodily Injury and Host Liquor Liability coverage (if applicable), together with the costs and expenses of the defense and/or adjustment of injury or damage, without exception, from or in any way related to any operation or activity conducted under this Agreement and/or of the Hotel, including adjacent areas like swimming pools, parking lots, restaurants, and bars. Your Automobile Liability Policy must cover owned, hired and non-owned vehicles used in the operation of the Hotel. The policies described in this <u>Section 12(b)(2)</u> must cover lawsuits or actions brought anywhere in the world. These policies must provide limits per location and per occurrence as required in the Rules and Regulations and must be accompanied by a waiver of subrogation in favor of the Additional Insureds. You may meet the required total minimum limits through a combination of primary and umbrella policies. If alcoholic beverages are sold at the Hotel (whether or not you own the establishment that sells the alcohol), you must purchase and maintain Dram Shop/Liquor Liability Insurance with such limits as required in the Rules and Regulations.

3.    <u>Workers' Compensation</u>. Statutory Workers Compensation and Employers Liability insurance with minimum Employers Liability limits per accident and per disease as required in the Rules and Regulations.

4.    <u>Business Interruption</u>. Business interruption insurance that shall provide for coverage of a minimum of three (3) months in the event the Hotel is not operational at any time during the Term. Your business interruption insurance policy must name us as a specific loss payee.

5.    <u>Cyber Liability</u>. Cyber Liability insurance providing minimum coverage as required by the Rules and Regulations.

c.    <u>Additional Insured Requirement</u>. You must also obtain and attach an endorsement for all commercial automobile, commercial general and umbrella policies used to meet the requirements in <u>Sections 12(a) and 12(b)</u> adding us, our affiliates and subsidiaries, our and their respective officers, directors, agents, partners and employees, as additional insureds ("<u>Additional Insureds</u>").

d.    <u>Rating; Primary Coverage; Notice of Change</u>. You must place your insurance with insurance companies reasonably acceptable to us and with an A.M. Best Rating of A-, VI or better. All insurance, commercial automobile, commercial general liability, umbrella and dram shop/liquor liability (if applicable), that you purchase must be specifically endorsed to provide that the coverage will be primary and that any insurance carried by Additional Insureds will be excess and non-contributory. We may reasonably change the insurance coverage requirements set forth in this <u>Section 12</u> during the Term by giving you at least 30 days' notice of the change. You must comply with our directions, at your expense, and deliver to us evidence

16

**CAD92 – 0000037968**

of your compliance before the change becomes effective.

e.   Certificates of Insurance. You must send us, by no later than ten (10) days prior to Construction Start and/or the Opening Date, as applicable under Sections 12(a) and 12(b), certificates of insurance, endorsements, declarations and/or other documents requested by us, indicating your property code, the Hotel name and address, and proof that you have purchased the required insurance coverage and the Additional Insureds endorsement has been accepted by your insurance carrier. You must also provide us with evidence of renewal before the expiration date of each insurance policy. You are responsible for providing us with 30 days' advanced written notice if the certificate of insurance by the insurer has been canceled, reduced in coverage, or otherwise altered. Acceptance by Choice of an improper certificate of insurance shall not constitute a waiver, release or modification of any of the insurance coverage and endorsements required under this Agreement.

f.   Procurement of Insurance. If you, for any reason, fail to procure or provide us with evidence that you maintain at least the minimum insurance required by Section 12(a) or 12(b), as applicable (or as designated by us from time to time in the Rules and Regulations) together with the endorsement required by Section 12(c), you acknowledge and agree that we will have the immediate right and authority, but not the obligation, to procure such insurance on your behalf, and charge you the cost of the insurance and, at our option, a reasonable penalty. You agree that you will reimburse us for the cost of such insurance and for any reasonable out-of-pocket costs that we incur should we elect to obtain such insurance within 30 days of receipt of our notice that such costs are due and payable to us.  The foregoing shall not limit our right to terminate this Agreement pursuant to Section 10(b)(2)(g).

g.   No Waiver of Obligations. Your purchase and maintenance of insurance and your performance of your obligations under this Agreement are in addition to your obligation to indemnify us. If applicable, you should obtain additional insurance coverage since we do not require insurance against all potentially insurable risks, such as Employment Practices Liability insurance; if you do, for your protection, you should name us as an Additional Insured on this additional coverage.

**13. Indemnification**. To the fullest extent permitted by law, you must defend, indemnify and hold harmless us, our affiliates and subsidiaries, our and their respective officers, directors, agents, partners and employees (each, an "Indemnified Party") from and against any claim, loss, cost, damage, expense judgment and liability, including, but not limited to, employment related liability and environmental liability (a "Claim"), including reasonable attorneys' fees (whether or not a lawsuit has been filed) and any court costs, resulting in whole or in part from any damage or loss, including personal injury, of any nature, connected with the Hotel construction, renovation or operation, or any facilities that are managed by others in the Hotel, or out of, or as a result of, in whole or in part your (or your agent's or employee's) error, omission, act or failure, even where negligence of an Indemnified Party is alleged, except to the extent that the loss, costs, damage, expense or liability is solely and proximately caused by the negligence of an Indemnified Party. Notwithstanding the foregoing, if we are required by a court of law to contribute to any Claim, the amount of our contribution will be calculated by applying principles of comparative negligence where a Claim was jointly caused by your negligence and by our negligence. You must reimburse us for all amounts we reasonably spend, including attorneys' fees and court costs, to protect the Indemnified Parties from, or to remedy, your defaults under this Agreement or claims arising out of your operation of the Hotel. We will have the sole and exclusive control (including the right to be represented by attorneys of our choosing) over the defense of any Claims against an Indemnified Party and over their settlement, compromise or other disposition. This provision will be deemed divisible, such that if it is in any way (or to any extent) determined to be invalid or unenforceable, it will be deemed modified so as to be valid and enforceable and to be in full force and effect to the fullest extent permitted by law. This provision will survive the expiration or earlier termination of this Agreement.

**14. Casualty.** If the Hotel is damaged by fire, natural disaster or other casualty, you must promptly and properly repair the damage. If the damage or repair requires closing the Hotel, you must immediately notify us, begin reconstruction within 6 months after that closing; reopen the Hotel for continuous business operation in accordance with the Rules and Regulations as soon as practicable (but in any event within 12

17

**CAD92 – 0000037968**

months after the Hotel closing), and send us at least 30 days' prior written notice of the date of reopening. Upon your written request, we will extend the Term of this Agreement by the number of days between the date of the original closing of the Hotel and the date of reopening. If insurance proceeds are not available or are insufficient to repair or rebuild the Hotel and if you provide us with reasonable evidence that such proceeds are not available to you within 6 months after the original closing of the Hotel, and provided that you are not in default at the time of casualty and are not the cause of the insurance proceeds not being available, then we will terminate this Agreement without penalty to either party.

**15. Notices.** All notices required or permitted under this Agreement must be in writing, must be personally delivered or mailed by registered or certified mail, return receipt requested, or by a nationally recognized delivery or courier service that allows tracking of packages or letters, to us at **Choice Hotels International, Inc., 1 Choice Hotels Circle, Suite 400, Rockville, Maryland 20850, Attention: General Counsel**, or at such other address we require upon written notice to you, and to you at the Designated Representative's address set forth in Section 1 of this Agreement. You authorize the Designated Representative to submit written notices to us or receive our written notices to you as your agent. Any notice by registered or certified mail or by delivery or courier service is deemed given and received at the date and time of sending. You may change the Designated Representative and/or the Designated Representative's address by written notice to us.

**16. Attorneys' Fees**. Attorneys' fees must be paid according to the terms of this Section 16 and also, as may be applicable, Section 13 of this Agreement. The prevailing party (as determined by the court or arbitrator) in any arbitration or claim filed to enforce the terms of this Agreement will recover from the other party the reasonable expenses of its attorneys, whether that attorney is employed by you or us or specially retained in connection with the proceeding, along with any court costs, arbitration costs, arbitrator fees, the reasonable costs of necessary expert witnesses, and the reasonable travel costs (including food and lodging) of the prevailing party's witnesses in the proceeding. If such a claim seeks, in whole or in part, attorneys' fees under Section 13, that provision will control. Attorneys' fees, including those payable to any attorney who is an employee of yours or ours, will be determined by reference to the usual and customary rate for such attorney, and the rates charged by attorneys of similar background and experience performing similar work in the area where the proceeding is conducted. Any judgment or arbitration award for fees or other amounts owed to us to enforce our rights under Section 4, Section 10(d) or Section 21 of this Agreement will bear interest at the rate referred to in Section 4(f) until paid.

**17. Taxes, Permits; Notice of Legal Actions**.

a.    Taxes. You must pay when due all taxes related to the Hotel that may be levied or assessed by any federal, state, or local taxing authority, and all other indebtedness related to the Hotel. You must pay any sales tax, gross receipts tax, or similar tax imposed on us (but not our income taxes) on any payments that you must make to us under this Agreement. If there is a bona fide dispute as to liability for taxes assessed or other indebtedness, you may contest the validity or the amount of the tax or indebtedness under the procedures of the taxing authority or applicable law. You may not permit a tax sale or seizure by levy of execution or similar writ or warrant, or attachment by a creditor to occur against the Hotel or the Location. If any amount to be paid or reimbursed under this Agreement to us, or any of our affiliates, is subject to state gross receipts or other state income tax, then you must pay or reimburse an additional amount to us (or to our affiliate as the case may be), so that the amount actually received by us (or our affiliate) after such deduction, payment or withholding will equal the full amount stated to be payable or reimbursable under this Agreement.

b.    Permits. You must timely obtain and maintain all permits, certificates, and licenses necessary for the construction, renovation, operation and maintenance of the Hotel, including licenses to do business, fictitious name registration and sales tax permits, health and sanitation permits, and ratings and fire clearances. You must send us, within 10 days of your receipt, copies of all inspection reports, warnings, certificates, and ratings, received from any governmental entity.

c.    Notice of Suit. You must notify us in writing and provide us with copies, within 5 days of your

18

CAD92 – 0000037968

DocuSign Envelope ID: 35901063-04FF-46B0-A786-4CA3043B5C09

receipt, of any actual or threatened criminal or civil action, suit, proceeding, or the issuance of any order, writ, injunction, award, or decree of any court, agency, or other governmental instrumentality affecting you or the Hotel.

18. **Approvals and Waivers.**

a. Approvals. Our approvals and consents will not be effective unless signed by one of our duly-authorized representatives. We may withhold our consent in our reasonable discretion or at any time when you are in breach of any obligation under this Agreement.

b. Reliance; No Liability. Except as otherwise expressly stated in this Agreement (including any addenda or amendments), we make no warranties or guarantees on which you may rely. We assume no liability or obligation to you by providing any waiver, approval, consent, suggestion to you, or by reason of any delay or denial of any request that you make to us.

c. No Waiver/Forbearance. Failure to exercise any power or to insist on strict compliance with any obligation or condition under this Agreement is not a waiver of any future right to demand exact compliance with any of the terms in this Agreement. Waiver of any particular default or extension of any cure period will not affect or impair a party's rights with respect to any later default of the same, similar, or a different nature. No delay, forbearance, or omission to exercise any power or right of a party following any breach or default of any of the terms, sections, or covenants of this Agreement by the defaulting party, will affect or impair the rights of the party not in default.

19. **Acknowledgments.**

a. No Warranty or Guarantee. You acknowledge and agree that you have conducted an independent investigation of the benefits of signing this Agreement, and you understand that the business venture contemplated by this Agreement involves business risks, and that its success will be largely dependent on your ability as an independent businessperson. We have not made, and you acknowledge that you have not received from us or our agents, any representations, projection, warranty or guarantee, express or implied, as to the profitability or other potential success of the business venture contemplated by this Agreement, except as expressly set forth in the Franchise Disclosure Document.

b. Limited Rights. You acknowledge and agree that this Agreement and the limited rights to use the Intellectual Property granted to you under this Agreement relate only to the Hotel and the Location. Except as may be specifically set forth in Section 2, this Agreement does not grant you any protected area, market or territorial rights. Subject to the terms of our then-current incremental impact policy ("Impact Policy") and our then-current version of the fair franchising policy ("Fair Franchising Policy"): (i) we may own, operate, or franchise other hotels and/or allow such hotels to use our Intellectual Property (including the Brand Mark), at any other location, either separately or combined; and (ii) we, and any of our affiliates and other franchisees may now or in the future engage in transient lodging or related business activities that may compete with the Hotel.

c. Control; No Duty; Independent Contractor. You acknowledge and agree that you are solely responsible for exercising ordinary, day-to-day business control over the Hotel, including all personnel and employment related matters and decisions and pricing of rooms and other services at the Hotel, regardless of any advice or consultation received from us. This includes, but is not limited to, hiring and firing employees, supervising and controlling employees' work schedules and conditions of employment, determining employees' rate and method of payment, and maintaining employees' employment records. Neither this Agreement nor the Rules and Regulations create a fiduciary or joint employer relationship between you and us or between your employees and us. You are an independent contractor. Nothing in this Agreement or the Rules and Regulations makes, or is intended to make, either party an agent, legal representative, subsidiary, joint venturer, partner, employee, joint employer or servant of the other (except that you agree that we may act as your agent when making reservations for your Hotel).

**CAD92 – 0000037968**

d.  No Right to Contract; No Third-Party Obligations; Truthfulness. You acknowledge and agree that you are not authorized to make any contract, agreement, warranty, or representation on our behalf, or to incur any debt or other obligation in our name; and we shall in no event assume liability for, or be deemed liable hereunder as a result of, any such action. You acknowledge and agree that you will not represent in any proposed financing agreement or to any proposed lender or participant in a public or private investment offering that we or any of our affiliates is, or will, become responsible for your obligations under the financing agreement, nor that we are, or will be, participating in any private or public investment offering. Before you distribute a prospectus of your intended private or public offering, you must send us a copy for our prior written approval, not to be unreasonably withheld, of references made to us in the prospectus. You warrant the truth and completeness of all your statements in your application and the content of all other documents that you send to us as part of the application process and that you are required to submit to us under this Agreement.

e.  Disclosure. You acknowledge that you received from us the Franchise Disclosure Document required by the Federal Trade Commission and by the applicable state(s) in which you live and where the Hotel is located at least 14 days before you signed this Agreement or paid to us any consideration for the hotel franchise.

f.  Ownership. You warrant that you are the true owner of, and record holder of title to, the Hotel, or that you are currently leasing the Hotel under a lease that allows you the right to enter into this Agreement. If you are a corporation, limited liability company, partnership, or other entity, all owners of the entity, including any subsequent person or entity that becomes an owner at any time after the Effective Date, shall sign our then-current form of personal guaranty agreement, unless expressly waived by us in our sole discretion.

g.  Data Security. You acknowledge and agree that we and you each own the rights in and to any data captured by the Property Management System or Reservation System ("Guest Data") and that we may use Guest Data in any reasonable manner that we determine. You also acknowledge and agree that you are obligated to comply with all information security and data privacy standards and requirements contained in the Rules and Regulations and all applicable federal and state laws, regulations, and standards relating to information security and data privacy, including, without limitation, the Payment Card Industry Data Security Standard ("PCI DSS"). You must secure all Guest Data against loss or theft and against unauthorized or unintended access, disclosure, copying, use or modification. You agree to notify us in writing as soon as practicable (and at least within 24 hours) of any known, suspected, or alleged security breach of Guest Data in your possession or custody or under your control. You also acknowledge and agree that you are obligated to indemnify us from and against any Claim resulting from any such data security breach pursuant to Section 13 of this Agreement. Without limiting the foregoing, to the extent we possess or otherwise provide services that allow for the storage, processing, or transmittal of Guest Data as defined by the PCI DSS ("Services"), or to the extent we could impact the security of the Guest Data environment, we will remain in compliance with the applicable PCI DSS requirements with respect to those Services. We will also remain aware of changes to the PCI DSS and implement all procedures and practices as may be reasonably necessary for the Services to remain in compliance with the PCI DSS, in each case at our sole cost and expense.

h.  System Fee. You acknowledge and agree that we may use the System Fee to meet all costs incident to providing the Hotel (and all Other Choice Brand Hotels) with marketing and advertising services, the Property Management System, and the Reservation System, and that such costs may include certain of our overhead expenses that are reasonably allocated to provide such services. You further agree that we have the absolute and unilateral right to determine, when, how and what portion of the System Fee may be used for (i) marketing purposes, including the right to purchase and pay for marketing services, product research and development, production materials, ad slicks, brochures, videotapes, radio and television commercials, media advertising (internet, e-commerce, television, radio, cable, magazines, newspapers and other print), services provided by advertising agencies, market research, trade shows, conventions, promotions, research and design, public relations, and loyalty programs, (ii) the development, operation and maintenance of the Property Management System and Reservation System, and (iii) the cost of

20

CAD92 – 0000037968

personnel, accounting services, travel expenses, office space, overhead costs, administrative costs, computers, other equipment, furniture, salaries and fringe benefits, development, design and maintenance of internet web-pages and websites, including internet service provider costs, network costs, and for other similar costs that we reasonably deem to be appropriate. You also acknowledge that other franchisees authorized to use our System may not contribute the same percentage or total amount that you must pay to us as the System Fee. You further acknowledge and agree that we are not obligated, in expending the System Fee, to make expenditures for your Hotel or Brand Mark which are equivalent or proportionate to your contribution.

     i.  <u>ChoiceAdvantage Software Terms of Use</u>. You acknowledge and agree that your right to use the Property Management System will be governed by the ChoiceAdvantage Software Terms of Use that are provided to you in an online format which you agree to review periodically. You acknowledge and agree that the ChoiceAdvantage Software Terms of Use are specifically incorporated as part of this Agreement and you will comply with the terms and conditions of the then-current ChoiceAdvantage Software Terms of Use. You agree that you, the Hotel's general manager, or any other authorized employee of the Hotel ("<u>Authorized User</u>") may accept and agree on behalf of you to the terms and conditions of the ChoiceAdvantage Software Terms of Use. You also acknowledge and agree that we have the right, in our sole discretion, to modify, add or remove any terms or conditions of the ChoiceAdvantage Software Terms of Use. Changes to the ChoiceAdvantage Software Terms of Use will be posted online and will be immediately effective. You agree that use by an Authorized User of the Property Management System after we post any such changes will indicate that you accept and agree to the ChoiceAdvantage Software Terms of Use, as modified.

     j.  <u>No Liability</u>. You acknowledge and agree that we will not assume liability for, or be deemed liable as a result of, any act or omission of yours relating to the construction, renovation, operation, maintenance or promotion of the Hotel or for any claim or judgment arising from such act or omission.

     k.  <u>Anti-Terrorism / Anti-Bribery Laws</u>. You individually represent and warrant to us that neither you (including your directors and officers, senior management and shareholders (or other persons) having a controlling interest in you), nor any affiliates or funding sources are (a) owned or controlled by, or acting on behalf of, the government of any country that is subject to an embargo imposed by the United States government; or (b) an entity or individual ("<u>Person</u>") identified by any government or legal authority under applicable laws as a Person with whom dealings and transactions by us are prohibited or restricted, including Persons designated on the U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) List of Specially Designated Nationals and Other Blocked Persons (including known terrorists and narcotics and human traffickers). You will promptly notify us in writing upon the occurrence of any event which would render the foregoing representations and warranties incorrect. You further represent and warrant to us that you, including persons having a controlling interest in you, are not in violation of any anti-money laundering laws, anti-terrorism, anti-bribery, trade sanctions or other laws or embargoes, including without limitation the U.S. Patriot Act and the U.S. Foreign Corrupt Practices Act and related regulations and executive orders. You represent and warrant that you are qualified to do business in the United States, have the authority to execute this Agreement, and are eligible under applicable United States laws to carry out the obligations under this Agreement and any subsequent assumption of your rights and obligations under this Agreement.

     l.  <u>Child Protection Code of Conduct</u>. We are a member of "The Code of Conduct for the Protection of Children from Sexual Exploitation in Travel and Tourism" (www.thecode.org) ("The Code"), which is an industry-driven responsible tourism initiative with a mission to provide awareness, tools, and support to the tourism industry in order to prevent the sexual exploitation of children.  You agree to support the principles of The Code and to take all reasonable steps at the Hotel, including the training of staff, to recognize and prevent all forms of human trafficking.

**20. <u>Miscellaneous.</u>**

     a.  <u>Severability</u>. If any section of this Agreement is held to be illegal, invalid or unenforceable, both

21

**CAD92 – 0000037968**

parties agree that (i) the section will be removed; (ii) this Agreement will be understood and enforced as if the illegal, invalid, or unenforceable section had never been in this Agreement; and (iii) the remaining sections will remain in full force and effect and will not be affected by the illegal, invalid, or unenforceable section or by its removal. A section similar to the removed section will be automatically added as a part of this Agreement to the maximum extent enforceable.

b.    No Third Party Beneficiaries. Except as otherwise expressly provided in this Agreement, nothing in this Agreement is intended, nor will anything in this Agreement be deemed, to confer on any person or legal entity other than us or you, or our respective successors and permitted assigns, any rights or remedies under or by reason of this Agreement.

c.    Headings. All captions and headings in this Agreement are intended solely for the convenience of the parties and do not affect the meaning or construction of any section.

d.    References. All references to the masculine, neuter, or singular, include the masculine, feminine, neuter, or plural. The word "include" and its derivatives are not to be construed as terms of limitation. If "you" consists of more than one person or entity, your acknowledgments, promises, covenants, agreements, and obligations made or undertaken in this Agreement are jointly and severally undertaken by each of you.

e.    Counterparts. If this Agreement is executed in multiple counterparts, each executed copy is an original.

f.    Governing Law. This Agreement becomes valid and effective only when we have signed it, and it will be interpreted under the substantive laws of Maryland, not including its conflict of laws provision or such provisions of any other jurisdiction; except that nothing herein shall be construed to establish independently your right to pursue claims under Maryland's Franchise Registration and Disclosure Law.

g.    Cumulative Rights and Remedies. Rights and remedies stated in this Agreement are cumulative and not exclusive of any other right or remedy.

h.    Attachments/Addenda. All attachments, addenda, and amendments to this Agreement are incorporated into and a part of this Agreement. Any addenda or amendments to this Agreement will not be effective unless signed by one of our duly-authorized representatives and by you. All duly-executed addenda and/or amendments are incorporated into and will become a part of this Agreement.

i.    Survival. Those of your obligations and our obligations under this Agreement which expressly or by their nature survive the expiration or earlier termination of this Agreement will survive such expiration or termination, including, but not limited to, Sections 7, 10(d), 11, 13, 16, 17, 18, 19, 20, 21, 22, 23 and 24.

j.    Seal. This Agreement is a contract under seal and is intended by the parties to be a specialty under Maryland law.

k.    Electronic Signatures. The parties hereby acknowledge and agree that electronic signatures, facsimile signatures or signatures transmitted by electronic mail in so-called "pdf" format shall be legal and binding and shall have the same full force and effect as if an original of this Agreement had been signed and delivered by hand.  You and we both (i) intend to be bound by the signatures (whether original, faxed or electronic) on any document sent by electronic means, (ii) are aware that the other party will rely on such signatures, and (iii) hereby waive any defenses to the enforcement of the terms of this Agreement based on the foregoing forms of signature.

**21.    Arbitration. Except for our claims against you for indemnification or actions seeking to enjoin you from using any of our Intellectual Property (including the Brand Mark) or the Choice-Related Words in violation of this Agreement or any other related agreements (including the ChoiceAdvantage Software Terms of Use), any controversy or claim arising out of or relating to this**

22

Agreement or any other related agreements, or the breach of this Agreement or any other related agreements, including any claim that this Agreement or any part of this Agreement or any related agreements is invalid, illegal, or otherwise voidable or void, as well as any claim that we violated any laws in connection with the execution or enforcement of this Agreement or any related agreements and any claim for declaratory relief, will be sent to final and binding arbitration in the state of Maryland before either the American Arbitration Association, J.A.M.S., or National Arbitration Forum in accordance with the Commercial Arbitration Rules of the American Arbitration Association, including its rules for emergency measures of protection, except to the extent that the Commercial Rules of the American Arbitration Association may be interpreted to require you or us to produce documents, witnesses, or information at a time other than at a hearing on the claim without our mutual consent. In the event more than one demand for arbitration is filed in connection with this Agreement or any related agreements, the demand filed with the American Arbitration Association, J.A.M.S., or National Arbitration Forum office having jurisdiction over Maryland proceedings shall take precedence, and any other demand shall be withdrawn and presented in the Maryland filing. The arbitrator will apply the substantive laws of Maryland, without reference to its conflict of laws provision, except that nothing herein shall be construed to establish independently your right to pursue claims under Maryland's Franchise Registration and Disclosure Law. Judgment on the arbitration award may be entered in any court having jurisdiction. If any party fails to appear at any properly noticed arbitration proceeding, an award may be entered against the party, notwithstanding its failure to appear. Any arbitration will be conducted at our headquarters office in Maryland and the parties agree that any state laws attempting to prohibit arbitration in Maryland are pre-empted by the Federal Arbitration Act. Nothing in this <u>Section 21</u> will be construed as requiring you or us to make a claim in arbitration before exercising any rights you or we may have to give notice of default or termination in accordance with the terms of this Agreement or any related agreements.

22.    <u>NO CLASS ACTIONS</u>. NEITHER YOU NOR WE SHALL SEEK TO LITIGATE OR ARBITRATE AGAINST THE OTHER PARTY TO THIS AGREEMENT OR SUCH PARTY'S AFFILIATES, EITHER AS A REPRESENTATIVE OF, OR ON BEHALF OF, ANY OTHER PERSON, CLASS, OR ENTITY, ANY DISPUTE, CONTROVERSY, OR CLAIM OF ANY KIND ARISING OUT OF, OR RELATING TO, THIS AGREEMENT, THE RIGHTS AND OBLIGATIONS OF THE PARTIES, THE SALE OF THE FRANCHISE, OR OTHER CLAIMS OR CAUSES OF ACTION RELATING TO THE PERFORMANCE OF EITHER PARTY TO THIS AGREEMENT. NO ARBITRATION OR OTHER ACTION OR PROCEEDING UNDER THIS AGREEMENT SHALL ADD AS A PARTY, BY CONSOLIDATION, JOINDER, OR IN ANY OTHER MANNER, ANY PERSON OR PARTY OTHER THAN US AND YOU AND ANY PERSON IN PRIVITY WITH, OR CLAIMING THROUGH, IN THE RIGHT OF, OR ON BEHALF OF, US OR YOU, UNLESS BOTH WE AND YOU CONSENT IN WRITING. WE HAVE THE ABSOLUTE RIGHT TO REFUSE SUCH CONSENT. YOU AGREE AND ACKNOWLEDGE THAT ANY PROCEEDING DIRECTLY OR INDIRECTLY ARISING FROM OR RELATING TO THIS AGREEMENT, THE RELATIONSHIP BETWEEN THE PARTIES, OR ANY AGREEMENT OR RELATIONSHIP BETWEEN YOU AND US OR ANY AFFILIATE OF OURS WILL BE CONSIDERED UNIQUE ON ITS FACTS AND MAY NOT BE BROUGHT AS A CLASS OR GROUP ACTION.

23. <u>WAIVER OF JURY TRIAL</u>. EACH PARTY HEREBY KNOWINGLY, VOLUNTARILY, INTENTIONALLY, AND IRREVOCABLY WAIVES TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM, WHETHER AT LAW OR IN EQUITY, BROUGHT BY EITHER OF THEM AGAINST THE OTHER.

24.    <u>INTEGRATION</u>. THIS AGREEMENT, ALL OF ITS ATTACHMENTS, AND ANY AGREEMENT SPECIFICALLY MADE A PART OF THIS AGREEMENT PURSUANT TO THE TERMS HEREOF, CONTAIN THE COMPLETE UNDERSTANDING OF THE PARTIES AND REPLACE ANY PREVIOUS WRITTEN OR ORAL AGREEMENT ON THE SAME SUBJECT MATTER. NO REPRESENTATION, INDUCEMENT, PROMISE OR AGREEMENT, ORAL OR OTHERWISE, NOT CONTAINED IN THIS AGREEMENT, WILL BE OF ANY FORCE OR EFFECT. NOTHING IN THIS AGREEMENT OR IN ANY RELATED AGREEMENT, HOWEVER, IS INTENDED TO DISCLAIM THE

CAD92 – 0000037968

**REPRESENTATIONS WE MADE IN THE FRANCHISE DISCLOSURE DOCUMENT THAT WE FURNISHED TO YOU.**

**CAD92 – 0000037968**

**ATTACHMENT A**
**PROPERTY IMPROVEMENT PLAN**

**CAD92 – 0000037968**

DocuSign Envelope ID: 35901063-04FF-46B0-A786-4CA3043B5C09



          |  |

## Property Improvement Plan ("PIP") for property CAD92 Rodeway Inn

**Definitions:** BES = Before Entering System (Prior to Opening Date), AES = After Entering System (After Opening Date), REC = Recommended, WAIV = Waiver. The Due Date for each PIP item is identified below as either the BES Deadline (for BES items), or a specific date or number of months following the Opening Date (for AES, Recommended, or Waiver items).

To assist in the selection, location and purchasing of the required items found in this document please contact the Brand Solutions Procurement Services General Contact number at 1-888-797-7911 (Option 1). Submit plans/elevations/material samples as required to: Choice Hotels International, Product Design and Construction, 1 Choice Hotels Circle, Suite 400, Rockville, MD 20850.

All items marked with an * on this addendum are items which require submittal to Choice for approval prior to implementation.

### 1. OPERATIONS

| Operations | Item Type | Due Date/# of Months |
|---|---|---|
| 1.1. Franchisee and GM must complete "Choice Onboard" orientation/training or provide proof of successful prior completion from a previous franchise with us. | AES | 1 |
| 1.2. This PIP is subject to Choice management's approval and may change at a later date upon review by Choice. No PIP is final until executed by you and us in connection with the Franchise Agreement.<br><br>This PIP ("Property Improvement Plan") was written by Susan M. Rady on September 16, 2020 for a hotel located at the address 1301 N. El Camino Real, San Clemente, CA. | AES | 1 |
| 1.3. Compliance with the following items is required for all RODEWAY franchises:<br><br>1. Remove all indications of prior franchise affiliation (if applicable)<br>2. Provide all required brand standards and brand amenities<br>3. Provide High Speed Internet Service in all areas of the hotel with required landing page<br><br>NOTE: this does not reflect all brand programs and all brand requirements.<br>Consult Rules and Regulations for complete information on all requirements. | AES | 1 |
| 1.4. All architectural plans (interior as well as exterior) must be submitted and approved prior to the commencement of work to arch_submittal@choicehotels.com. All interior design selections (all public space and guest room selections) must be submitted and approved prior to purchase to Choice Hotels Openings Team. | AES | 1 |
| 1.5. The GM or any other Manager-level employee such as the AGM or Sales Manager of the Hotel must obtain certification by completing Hospitality Operations Success Training (HOST) and pass the examination, or provide proof of successful prior HOST attendance/certification from a previous franchise with us. | AES | 1 |
| 1.6. A minimum of one current property personnel must complete the Commitment to Clean Captain training and receive the applicable badge via ChoiceU. | AES | 1 |

### 2. EXTERIORS

| Building | Item Type | Due Date/# of Months |
|---|---|---|
| 2.1. Professionally power wash building walls, windows, walkways, drive surfaces; and clean light lenses to remove dirt and stains. Following professional cleaning, repair any damage to building finishes or appointments (i.e., fascia, eaves, steps, railings, walkways, doors, windows) and finish to coordinate with adjacent finish/color. | AES | 18 |

### 3. PUBLIC SPACES

| Lobby Design & Finishes | Item Type | Due Date/# of |
|---|---|---|

CAD92 – 0000037968

| | | Months |
|---|---|---|
| 3.1. Provide new lobby carpet and base.  DESIGN SUBMITTAL REQUIRED | AES | 12 |

## 4. GUEST ROOMS

| Guest Room | Item Type | Due Date/# of Months |
|---|---|---|
| 4.1. Clean PTAC units; and, repair or replace any damaged/inoperable or noisy units. | AES | 6 |
| **Guest Room Bath** | **Item Type** | **Due Date/# of Months** |
| 4.2. Ensure all baths have Choice tagged terry package. | AES | 1 |
| 4.3. Replace all damaged or stained caulking and grout at tubs/surrounds, toilet bases, vanities and floor tile and base. | AES | 18 |
| **Guest Room FF&E** | **Item Type** | **Due Date/# of Months** |
| 4.4.  Replace any damaged, worn or permanently stained guestroom soft seating (e.g., sofas/sleeper sofas, lounge chairs, activity chairs). DESIGN SUBMITTAL REQUIRED | AES | 12 |
| 4.5.  Replace any worn/damaged/aged/stained bedspreads/coverlets & bed skirts, pillows, linens, blankets or top of bed components with new. | AES | 6 |
| 4.6.  Replace any worn/damaged/sagging mattress & box spring sets, and any older than 7 years with new. | AES | 12 |
| **Guest Room Finishes** | **Item Type** | **Due Date/# of Months** |
| 4.7. Repair any damage to ceiling and wall finishes. | AES | 12 |
| 4.8. Replace all damaged, worn, stained or torn carpet with new.  DESIGN SUBMITTAL REQUIRED | AES | 12 |

[1]  All items listed above are in addition to compliance with Franchisor's standards and specifications, and Rules & Regulations.

27

CAD92 – 0000037968

## ATTACHMENT B

## RIDER TO THE FRANCHISE AGREEMENT

**1. Royalty Modification.**   Subject to the provisions of Section 3 below, Section 4(b)(1) of the Agreement is replaced by the following:

> You will pay us a monthly royalty fee ("Royalty Fee") in consideration of the license granted to you in Section 2 as follows:

> an amount equal to 4% of the preceding month's Gross Room Revenues for the "Term" of this Agreement.

**2. System Fee Modification.**  System Fee Modification.  Subject to the provisions of Section 3 below, Section 4(b)(2) of the Agreement is replaced by the following:

> You will pay us a monthly system fee ("System Fee") as follows:

> an amount equal to 2% of the preceding month's Gross Room Revenues for the "Term" of this Agreement.

The System Fee will be used to fund ongoing development, maintenance and upgrading of the Property Management System and Reservation System, and for advertising, publicity, public relations, marketing, promotional programs, website maintenance, reservations and other similar services that we will provide to you under this Agreement and for our System as further described in Section 19(h) below, as we determine in our sole discretion (collectively, the "System Fee"). You acknowledge and agree that (i) we may increase the System Fee due to cost increases attributable to inflation, increases in the costs of advertising, publicity, public relations or marketing, additional costs of implementing new or improved programs or systems, or increases in our cost of providing the Property Management or Reservation Systems or any of the other aspects of our System, so long as the increases apply to all or most of the U.S. hotels that are authorized to use the Brand Mark; (ii) we may assess additional fees and charges for various components of the System and other services (including promotional programs and use of proprietary software) as described in the Rules and Regulations; and (iii) we may advance monies for the purposes described herein in an amount reasonably necessary to ensure the provision of such services whether or not sufficient System Fees are then available and subsequently obtain reimbursement of such advances through the fee increases described above or utilizing future System Fees to recover previous monies advanced.

**3. Effect of Default**.  Unless and until you default under the terms of the Agreement, the modifications referred to in Section(s) 1 and 2of this Attachment will remain in effect.  For the purposes of this section, the term "default" shall mean any violation of the Agreement that is not cured within any applicable cure period pursuant to Section 10(b)(1) of the Agreement, or any violation of the Agreement that is not subject to an opportunity to cure pursuant to Section 10(b)(2) of the Agreement.  The referenced modification(s) are exclusive to you and are not transferable to any other party.

**4. Property Improvement Plan.** You agree to complete the list of improvements and/or repairs described in the Property Improvement Plan set forth in Attachment A (collectively, "PIP", or individually, a "PIP Item") by the deadlines set forth therein to meet the requirements of the Rules and Regulations, our brand standards, and such other standards and specifications that we require. Each PIP Item designated as "BES" must be completed by the deadline indicated, but in all cases prior to the Opening Date. Each PIP Item designated as "AES" must be completed by the deadline indicated, which may be after the Opening Date. Each PIP Item designated as "Recommended" is not required to be completed but is recommended. Failure to complete a Recommended PIP Item may negatively impact the guest experience and affect the brand promise. Recommended PIP Items do not constitute a waiver and may be required at any time per the

28

**CAD92 – 0000037968**

Quality Assurance inspection process. Each PIP Item designated as "Waived" is optional and does not need to be completed to satisfactorily complete the PIP. All items listed in the PIP are in addition to compliance with our standards and specifications and the Rules & Regulations.

Your failure to complete any required PIP Item by the applicable deadline will be considered a default of the Agreement, and we will have the right, among other things, to charge you our then-current non-compliance fee and/or to terminate the Agreement pursuant to Section 10. You may request a 3 month extension of any BES Deadline or AES Deadline, which we may grant in our sole discretion upon payment of a $5,000 extension fee.

**5. Effective Date of the Agreement.**  You agree upon taking possession of the Hotel to immediately provide us with a copy of the Deed for the Hotel, a copy of the Lease Agreement for the Hotel, or such other documents as we may request that are acceptable to us and demonstrate that you own the Hotel or have otherwise been granted the authority to operate the Hotel (the "Date of Possession Document").  Upon our receipt of the Date of Possession Document, you and we agree the Effective Date will be the later of (i) the date upon which you take possession of the Hotel, or (ii) the date upon which you and we agree to the terms of this Agreement, which will be evidenced by such Effective Date written by us on page 1 of the Agreement, and such date will serve as the effective date of the Agreement, and all related agreements that you execute in conjunction with the Agreement.  At that point, future invoices you receive from us will reflect any adjustment in Monthly Fees that might be required due to the change of the effective date of the Agreement.  Notwithstanding anything to the contrary, if the Date of Possession Document is dated prior to the Effective Date, then you acknowledge and agree that you will be obligated to pay us the maximum fees payable under Section 4(b) of the Agreement during the period beginning upon date of the Date of Possession Document and ending on the Effective Date.

**6. Confidentiality.** You agree to keep the grant of the modification(s) contained in this Attachment B in strict confidence and will not disclose them to any persons other than your directors, officers, partners, employees, agents and advisors who have a need to know for the purpose of operating the Hotel.  Any unauthorized disclosure is a default under the Agreement, and we may, at our option, immediately terminate the Agreement on notice to you or may revoke the modification(s) contained in this Attachment B upon any unauthorized disclosure by you.  The modification(s) outlined in this Attachment B are for the Hotel only and do not indicate that other hotels owned by you or by others will receive similar modification(s).  You acknowledge and agree that nothing in this Section prohibits us from disclosing the terms of this Attachment to any vendors, lenders, or other third parties as we determine in our reasonable discretion.

**7. Defined Terms; Integration.** Certain capitalized terms may not be defined in this Attachment B or the Agreement and such terms are being used in the normal course of dealing and as commonly used in the hospitality industry in order to assist you to better understand your obligations under this Attachment B.  This Attachment B is incorporated into and will become a part of the Agreement when duly signed.

**8. Order of Precedence**.  In the event of any conflict inconsistency between the terms of the Agreement and the terms of this Attachment B, the terms of this Attachment B will supersede and control.  In all other respects, the terms of the Agreement are ratified and confirmed.

Attachment B

29

**CAD92 – 0000037968**

We and you agree to be bound by the terms and conditions of this Agreement, including all Attachments, by setting the hands and seals of our duly authorized and empowered representatives on this Agreement, effective on the first date written above.  This Agreement may be signed with full legal force and effect using electronic signatures and records.

**Choice Hotels International, Inc**.,
a Delaware corporation

By _____ (Seal)
Name: Christopher J. Wallace
Title: Vice President and Assistant General Counsel


Date: ___10/09/2020_____


**BHANAA INVESTMENTS INC,** a **California corporation**


By: _____ (Seal)
Name: Jigna D. Kumbhani
Title: President


Date: ___10/07/2020_____


# PLEASE INITIAL THE ATTACHED SCHEDULE A

30

CAD92 – 0000037968

## Schedule A – Entity Ownership Breakdown

By initialing this Schedule A that is attached to the Franchise Agreement, you certify that the information provided below is true and accurate.  The following represents the names and percentages owned of **BHANAA INVESTMENTS INC.**

| *Name of Member/Shareholder/Partner* | *Percentage owned* |
| --- | --- |
| Jigna D. Kumbhani | 100% |

**INITIAL HERE**

31

**CAD92 – 0000037968**

DocuSign Envelope ID: 1B735043-BF3E-4289-8311-96BAEAF51604

CAD92 - 0000037968
Rodeway Inn, San Clemente

## ADDENDUM NO. 1

THIS ADDENDUM (this "Addendum") is between **Choice Hotels International, Inc.** ("we" or "us"), a Delaware corporation and **BHANAA INVESTMENTS INC., a California corporation** ("you") and effective as of the date last written below.

## BACKGROUND:

A.       We and you are parties to a Franchise Agreement dated October 9, 2020 (as amended, the "Agreement"), pursuant to which we have granted and you have accepted a license to operate a **Rodeway Inn** hotel business at **1301 N El Camino Real, San Clemente, CA 92672** (the "Hotel").

B.       The parties mutually desire to amend the Agreement on the terms provided in this Addendum.

NOW THEREFORE, in consideration of the promises and for other good and valuable consideration, the parties agree as follows:

1.       **Term.** Provided that we complete execution of the proposed **QUALITY INN repositioning** franchise agreement for the Hotel, Section 3 of this Agreement is hereby deleted and replaced by the following:

"3.       **Term**. The term of this Agreement ("Term") begins on the date both you and we sign the Agreement and ends on the earlier of:  i) **six (6) months following the date which we complete execution of the repositioning franchise agreement to the QUALITY INN Brand Mark** or ii) the date we approve you to begin renting sleeping rooms at the Hotel under the fully executed QUALITY INN franchise agreement."

2.       **General Release.** You and your managers, members, officers, directors, stockholders, agents, employees, successors, personal representatives, assigns, affiliates, guarantors, and heirs release and forever discharge us, our current and former affiliates, and our and our affiliates' current and former officers, directors, stockholders, employees, agents, successors, and assigns, of and from all manner of claims, actions, causes of action, suits, debts, liabilities, obligations, covenants, damages, and demands whatsoever, in law or in equity, known or unknown, vested or contingent, that you or your managers, members, officers, directors, stockholders, agents, employees, successors, personal representatives, assigns, affiliates, guarantors, or heirs have ever had, now have, or may hereafter have by reason of any event, transaction, or circumstance whatsoever, which occurred or arose on or before the date of this Addendum, relating to, directly or indirectly, the Hotel, the Franchise Agreement, or any other agreement entered into between any of the releasor parties and any of the releasee parties herein.

(a)       California Civil Code §1542 provides as follows:

A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which, if known by him must have materially affected his settlement with the debtor.

CIVIL CODE §1542 IS WAIVED BY THE PARTIES, EXCEPT AS OTHERWISE PROVIDED IN THIS ADDENDUM.

3.       **Confidentiality.** You agree to keep the grant of the modification(s) contained in this Addendum in strict confidence and  not disclose them to any persons other than your directors, officers, partners, employees, agents and advisors who have a need to know for the purpose of operating the Hotel. Any unauthorized disclosure is a default under the Agreement, and we may, at our option, immediately terminate the Agreement on notice to you or revoke the modification(s) contained in this Addendum upon any unauthorized disclosure

Postexecu2020\CAD92-Rodeway Inn
12/18/20



DocuSign Envelope ID: 1B735013-BF3E-4288-9311-96BAEAF51694

by you. The modification(s) outlined in this Addendum are for the Hotel only and do not indicate that other hotels owned by you or by others will receive similar modification(s). You acknowledge and agree that nothing in this Section prohibits us from disclosing the terms of this Addendum to any vendors, lenders, or other third parties as we determine in our reasonable discretion.

4.    **Defined Terms; Integration.** Certain capitalized terms may not be defined in this Addendum or the Agreement and such terms are being used in the normal course of dealing and as commonly used in the hospitality industry in order to assist you to better understand your obligations under this Addendum. This Addendum is incorporated into and will become a part of the Agreement when duly signed.

5.    **Order of Precedence.** In the event of any conflict or inconsistency between the terms of the Agreement and the terms of this Addendum, the terms of this Addendum will supersede and control. In all other respects, the terms of the Agreement are ratified and confirmed.

6.    The parties to this Addendum agree to be bound by the terms of this Addendum as of the effective date of the Agreement as evidenced by their signatures below.

IN WITNESS WHEREOF, the parties have set their hands and seals on _____December 31, 2020_____.

Attest:

Choice Hotels International, Inc.,
a Delaware corporation

By:_____

Name: Denise Wills
Title: Manager, Franchise Administration

Name: Christopher J. Wallace
Title: Vice President and Assistant General Counsel

**BHANAA INVESTMENTS INC., a California corporation**

By:_____
Name: Jigna D. Kumbhani
Title:  President

Date: X 12/29/2020 ,

Postexecu2020\CAD92-Rodeway Inn
12/18/20



1 Choice Hotels Circle, Suite 400, Rockville, MD  20850  (301) 592-5000

Page 2 of 2

**EXHIBIT 3**

Choice Hotels International Inc

CAD92 – 0000037968
Rodeway Inn

## GUARANTY

This Guaranty ("Guaranty") is made as of ___october 9, 2020_____ by **Jigna D. Kumbhani, individually** ("Guarantor"), in favor of and for the benefit of Choice Hotels International, Inc., a Delaware corporation ("Choice"). In consideration of and as an inducement to Choice to execute a Franchise Agreement by and between Choice and **BHANAA INVESTMENTS INC**, a **California corporation** ("Franchisee"), Guarantor agrees as follows:

1.      Guarantor unconditionally warrants to Choice and its successor and assigns that all of Franchisee's representations and warranties in (a) any application submitted by Franchisee to Choice; and (b) the Franchise Agreement are true, accurate and complete as of the time made as of the date of this Guaranty.

2.      Guarantor personally and unconditionally guarantees that all of Franchisee's obligations under the Franchise Agreement, as amended, and all related agreements will be punctually paid and performed.

3.      Guarantor agrees that the obligations of Guarantor under this Guaranty shall not be reduced, limited, terminated, discharged, impaired or otherwise affected by: (a) the occurrence or continuance of a default under the Franchise Agreement or any related agreement; (b) any assignment of the Franchise Agreement; (c) any modification or amendment of, or waiver or consent or other action taken with respect to the Franchise Agreement or any related agreement; (d) the voluntary or involuntary liquidation, sale or other disposition of Franchisee's assets, or the receivership, insolvency, bankruptcy, reorganization or similar proceedings affecting Franchisee or its assets or the release or discharge of Franchisee from any of its obligations under the Franchise Agreement; or (e) any change of circumstances, whether or not foreseeable, and whether or not any such change does or might vary the risk of Guarantor hereunder. Any failure by Choice to exercise any power or right or to insist upon Guarantor's compliance with any term under this Guaranty shall not constitute a waiver of Choice's right to demand full compliance with any term of this Guaranty.

4.      Guarantor unconditionally and irrevocably waives notice of acceptance of this Guaranty, presentment, demand, diligence, protest and notice of dishonor or of any other kind to which Guarantors otherwise might be entitled under applicable law.

5.      Guarantor agrees to promptly pay all sums owed to Choice and its subsidiaries or affiliates, and all damages, costs, and expenses, including reasonable attorneys' fees, that Choice or its subsidiaries or affiliates incur as a result of any default under this Guaranty, the Franchise Agreement, or any related agreement, including all outstanding fees, any liquidated damages due under the Franchise Agreement, and any costs and expenses that Choice or its subsidiaries or affiliates incur to obtain injunctive relief for the enforcement of any portion of this Guaranty, the Franchise Agreement, or any related agreement.

6.      If more than one person or entity has signed this Guaranty as a Guarantor, the liability of each such Guarantor shall be joint, several and primary. Each Guarantor shall be bound by his/her/its/their signature block below, and such Guarantor's obligations hereunder are not contingent on any other Guarantor being bound hereby.

DocuSign Envelope ID: 35901063-04FF-46B0-A786-4CA3043B5C09

7.      All notices required or permitted under this Guaranty must be in writing, must be personally delivered or mailed by registered or certified mail, return receipt requested, or by a nationally recognized courier service, to Choice at **Choice Hotels International, Inc., 1 Choice Hotels Circle, Suite 400, Rockville, Maryland 20850, Attention: General Counsel**, and to Guarantor care of the Designated Representative at the address set forth in the Franchise Agreement.  Any notice by registered or certified mail or by courier service is deemed given and received at the date and time of sending.  Guarantor may change its address only by written notice to Choice, and Choice may change our address by written notice to Guarantor.

8.      This Guaranty will be interpreted under the substantive laws of Maryland, not including its conflict of laws provision or such provisions of any other jurisdiction.

9.      Except for Choice's claims for indemnification or actions seeking to enjoin Guarantor from using any of Choice's Intellectual Property or the Choice-Related Words in violation of the Franchise Agreement, any controversy or claim founded upon or arising out of or relating to this Guaranty, the Franchise Agreement, or any related Agreement, or to the breach of this Guaranty, the Franchise Agreement, or any related Agreement, will be sent to final and binding arbitration before either the American Arbitration Association, J.A.M.S., or National Arbitration Forum in accordance with the Commercial Arbitration Rules of the American Arbitration Association, including its rules for emergency measures of protection, except to the extent that the Commercial Rules of the American Arbitration Association may be interpreted to require Guarantor or Choice to produce documents, witnesses, or information at a time other than at a hearing on the claim without the parties' mutual consent.  In the event more than one demand for arbitration is filed in connection with this Guaranty, the Franchise Agreement, or any related Agreement, the demand filed with the American Arbitration Association, J.A.M.S., or National Arbitration Forum office having jurisdiction over Maryland proceedings shall take precedence, and any other demand shall be withdrawn and presented in the Maryland filing.  The arbitrator will apply the substantive laws of Maryland, without reference to its conflict of laws provision, except that nothing herein shall be construed to establish independently a right to pursue claims under Maryland's Franchise Registration and Disclosure Law. Judgment on the arbitration award may be entered in any court having jurisdiction.  If any party fails to appear at any properly noticed arbitration proceeding, an award may be entered against the party, notwithstanding its failure to appear.  Any arbitration will be conducted at Choice's headquarters office in Maryland.  Nothing in this Section will be construed as requiring Guarantor or Choice to make a claim in arbitration before exercising any rights Choice or Guarantor may have to give notice of default or termination in accordance with the terms of this Guaranty.

IN WITNESS WHEREOF, the undersigned have set his/her/its/their hands and seals on the date noted above.

**Jigna D. Kumbhani,** individually

X: _Jigna D. kumbhani_ L.S.
— DocuSigned by:
— 01D533F61B094A4...

Social Security No. ▬▬▬▬▬

Date: __10/07/2020__

Address: __13621 Mica ave,__

__victorville, ca 92394__

# EXHIBIT 4

**CHOICE**
HOTELS™

April 24, 2025

Via Email: dalsukh@gmail.com
Via FedEx Number: 880786609497

BHANAA INVESTMENTS INC.
Attn: Jigna D. Kumbhani
13621 Mica Avenue
Victorville, CA 92392

RE:   Rodeway Inn Franchise Agreement (**CAD92**), with BHANAA INVESTMENTS INC. ("Franchisee") dated October 9, 2020 (the "Franchise Agreement").

**NOTICE OF TERMINATION**

Dear Mr. Kumbhani:

Choice has been advised that, on or about April 16, 2025, Franchisee ceased operating Choice property code: **CAD92** under the **Rodeway Inn** marks as required by the Franchise Agreement. As a result, the Franchise Agreement is hereby terminated effective **April 24, 2025 ("Termination Date")** pursuant to Section 10(b)(2)(b) of the Franchise Agreement.

Accordingly, the hotel listing related to the Franchise Agreement will be removed immediately from choicehotels.com, and guests will no longer be able to make reservations at the hotel through Choice's Central Reservation System. Choice will proceed to contact all guests holding future hotel reservations to inform them that the hotel is no longer operating as a **Rodeway Inn®** and will offer to relocate them at their option.  Please also be advised that access to choiceAdvantage and the data retrievable thereby will be cut off 45 days from the Termination Date.

Failure to comply with the post-termination obligations set forth herein and in Section 11 of the Franchise Agreement by the deadlines stated below will result in Choice taking necessary and appropriate action, including legal action, against Franchisees and Guarantors without further demand or notice.

**IMMEDIATE ACTION REQUIRED:**

- Payment to Choice of **$212,268.64** which includes estimated indebtedness for outstanding franchise and related fees in the amount of $134,075.95 through the Termination Date. Also included are the lost profits damages totaling $78,192.64 calculated pursuant to Section 10(d)(2) of the Franchise Agreement for the remainder of the Term;

- Cease and desist representing and identifying the above-referenced hotel as a **Rodeway Inn®** hotel;

- Cease and desist answering the telephone or identifying the hotel through voice recording as a **Rodeway Inn®** hotel;

Jigna D. Kumbhani
April 24, 2025
Page 2

- Remove (or adequately cover until removed) at your expense all signs and other displays or usage of Choice's trademarks, service marks and other proprietary marks ("Choice Marks") in accordance with the attached De-Identification Checklist;

- Cancel all advertisements, regardless of form, using the Choice Marks;

- Cancel all social media accounts using the Choice Marks.

**REQUIRED ACTION WITHIN 15 DAYS AFTER TERMINATION DATE**

- Contact your domain registrar(s) to disable and delete the registrations of any domain names that contain the Choice Marks (i.e. comfortinnkillingtonvt.com). For assistance, you may contact Choice's E-Commerce Department at DomainHelp@choicehotels.com.

- Contact online travel agents (OTAs) and other travel web sites known to contain an improper listing of the Hotel and arranged for removal or alteration of the Hotel's listing.

- **Return a signed copy of the attached Certification of Compliance (along with photographs) to Choice by e-mailing it to tmi@choicehotels.com or mailing it to Choice Hotels International, Attn: TMI, 915 Meeting Street, Suite 600, North Bethesda, MD 20852.** If we do not receive this documentation by the above date, then a representative of Choice will visit the property to ensure compliance. You will be responsible for all fees and costs in connection with such property visit in addition to other fees and damages.

Any continued unauthorized use of the Choice Marks in connection with the hotel constitutes trademark infringement for which Franchisees and Guarantors are liable to Choice for injunctive relief, damages and attorneys' fees pursuant to the Franchise Agreement and the Lanham Trademark Act of 1946. **The Franchise Agreement also requires that additional liquidated damages for trademark infringement must be paid to Choice in the amount of $2,500 per day for each day Choice Marks are used in connection with the hotel following the Termination Date.**

If you have any questions regarding fees or damages, please contact Jamie Thrasher, Senior Paralegal – Arbitration at (301) 592-5122. If you have any other questions regarding this Notice of Termination, please contact me at (301) 628-5854 or Zachary.Berge@choicehotels.com

Sincerely,

CHOICE HOTELS INTERNATIONAL, INC.

*Zachary E. Berge*

Zachary E. Berge
Senior Counsel

mb: ZEB
Enclosures

Jigna D. Kumbhani
April 24, 2025
Page 3


cc:     <u>Via email:</u>
        Latrice Gipson, Area Director
        Tim Ford, OPS
        Suzanne Howela, Collecitons Analyst
        Jamie Thrasher, Senior Paralegal
        Juanita Adams, Franchisee Support Specialist 1
        Contract Services
        Credit

        <u>Via e-mail.CAD92@stayatchoice.com</u>
        General Manager
        1301 N. El Camino Real
        San Celmente, CA 92672

        <u>Via FedEx Number *</u> <u>880786632484</u>
        Jigna D. Kumbhani
        13621 Mica Avenue
        Victorville, CA 92394

915 Meeting Street, Suite 600, North Bethesda, MD 20852

Jigna D. Kumbhani
April 24, 2025
Page 4

**CERTIFICATION OF COMPLIANCE**
**WITH POST-TERMINATION REQUIREMENTS**

The undersigned, as an authorized representative for the former **Rodeway Inn®** hotel located at **1301 N. El Camino Real, San Celmente, CA 92672** ("Hotel"), hereby certifies that:

1. I have personal knowledge of the facts stated in this Certification and am authorized to sign this Certification on behalf of the Hotel.

2. I make this Certification in connection with this Notice of Termination, pursuant to which the Choice Hotels International, Inc. ("Choice") franchise agreement for the Hotel was terminated.

3. I understand and acknowledge that Choice is the owner of certain trademarks, trade names, service marks, logos, and other similar identification symbols (the "Choice Marks"), which are protected by federal trademark registrations and common law rights.

4. I understand and acknowledge the post-termination obligations set forth in the Notice of Termination.

5. I personally checked and verified that:

    a. The Hotel no longer uses any of the Choice Marks on the Hotel premises, on any interior or exterior signage, in Hotel advertisements, in connection with any domain names or social media sites, or otherwise.

    b. I have removed all Choice Marks from websites advertising this hotel, and have contacted our domain registrar(s) to <u>disable and delete the registrations of any domain names that contain the Choice Marks</u> (i.e. comfortinnkillingtonvt.com).

    c. The Hotel has ceased answering the telephone as a **Rodeway Inn®** hotel and has changed all telephone voice recordings.

    d. The Hotel has made reasonable efforts to contact online travel agents (OTAs) and other travel web sites known to contain an improper listing of the Hotel and arranged for removal or alteration of the Hotel's listing.

    e. The Hotel no longer states or implies in any way to any person that the Hotel is affiliated with or endorsed by Choice in any way whatsoever.

915 Meeting Street, Suite 600, North Bethesda, MD 20852

Jigna D. Kumbhani
April 24, 2025
Page 5

6. I have attached <u>photographs</u> evidencing my removal of all exterior and interior signage at the Hotel.

Signature: _____

Print Name: _____

Title: _____

Date: _____

Hotel Address: _____

Property Code: **CAD92**

**Please return this Certification form by e-mail to tmi@choicehotels.com or by overnight mail to:**

**Choice Hotels International, Inc.**
**915 Meeting Street, Suite 600, North Bethesda, MD 20852**
**Attn: TMI**

Jigna D. Kumbhani
April 24, 2025
Page 6



## Hotel De-identification Checklist

*This list is NOT all inclusive.  It is your responsibility to remove all items bearing Choice's trademarks*

**Property Brand and address:**

**Choice Property Code:**

| Area | Description | Complete | Photo Required | Notes |
|---|---|---|---|---|
| **Exterior Signage** | | | | |
| | Immediately "bag" monument, building, pole/pylon and entrance signs | | X | |
| | Permanently remove all branded exterior sign faces | | X | |
| | Replace any parking lot, garage and misc. exterior signage that displays a brand name/logo | | X | |
| | Repaint/rewrap vans to remove any brand/logo references | | X | |
| | Change airport signs, airport reader boards to new hotel/business and cease all airport advertising under Choice brands | | | |
| | Change all billboards, DOT Highway Exit signs to new hotel/business (provide documentation of work to be completed) | | | |
| **Interior Signage** | | | | |
| | Remove any/all branded/logo interior signage including, but not limited to:<br>• Entrance Signage<br>• Lobby Display/Backdrop<br>• Franchisee/owner plaque<br>• Guestroom Door Signage | | X | Lobby display, entrance signage, and branded plaque photos required |
| **Interior Common** | | | | |
| | Remove and destroy all branded promotional materials, keycards and logo items | | | |
| | Remove and destroy all Choice Privileges program keycards, marketing and collateral material | | X | |
| | Remove and destroy all branded welcome mats/walk-off mats | | | |
| | Cease use of all branded letterhead, envelopes and business cards | | | |
| | Change any folio paper and/or folio messages that have a branded logo or name | | | |
| | Remove and destroy branded Uniform Name Tags | | | |
| | Remove Breakfast Graphics/Signage | | | |
| | Remove Breakfast Room Wall Art | | | |
| | Remove Fitness Room Wall Art | | | |
| **Guestrooms** | | | | |
| | Remove all branded collateral materials (TV channel guides, guest directories, etc.) | | | |
| | Remove all brand/logo Guestroom amenities (soap, shampoo, toiletries, laundry bags, Do Not Disturb cards, logo'd cups, logo'd coffee, etc.) | | | |
| | Replace all brand logo telephone faceplates | | X | |
| | Remove and destroy branded/logo evacuation/safety & security cards | | X | |
| | Remove any/all brand reference on irons, bags or other guest supplies | | | |
| | Remove Choice logos from the towels, bedding and pillows. | | | |
| **Internet** | | | | |
| | **Google Business Listing:**<br>Set up a new Google Business listing under your new hotel name making sure that your hotel profile picture does not contain an image of Choice branded signage. | | | |
| | **Third-party booking and/or review sites:**<br>Cease use of the Choice brand name, including with the use of "formerly " and images on all third-party websites including  review sites (**including BUT NOT LIMITED TO TripAdvisor, Booking.com, Expedia, Priceline, Hotels.com)** | | | |
| | **Social Media Sites:**<br>Immediately cease use of and disable social media sites under Choice brands, including but not limited to Facebook, Instagram, Twitter and YouTube | | | |
| | **Franchisee owned and controlled domain names (vanity websites):**<br>If you chose to purchase and set up a website on a **brand-related domain name** either personally or through a web developer, you must immediately disable the website and the domain name and allow the domain name registration to expire. | | | |
| | Remove all Yellow Pages and Directory Assistance references to a Choice brand | | | |
| **Phone and Wireless** | | | | |

915 Meeting Street, Suite 600, North Bethesda, MD 20852

Jigna D. Kumbhani
April 24, 2025
Page 7

| | | | | |
|---|---|---|---|---|
| | Cease & desist answering phone as Choice brand hotel, disable auto attendant brand messaging | | | |
| | Change on hold message to reflect new hotel/business | | | |
| | Change Wireless Network Names to remove references to Choice brands | | | |

**Signature:**

**Print Name & Title:**

**Date:**

915 Meeting Street, Suite 600, North Bethesda, MD 20852

**EXHIBIT 5**



July 1, 2025

Via mail: dalsukh@gmail.com
Via FedEx No.: *882442479482

BHANAA INVESTMENTS INC.
Attn: Jigna D. Kumbhani
13621 Mica Avenue
Victorville, CA 92392

RE:    **SERVICE MARK INFRINGEMENT**
Former RODEWAY INN® (CAD92), 1301 N. El Camino Real, San Clemente, CA 92672

Dear Mr. Kumbhani:

Choice Hotels International, Inc. ("Choice") has learned that, despite our explicit **April 24, 2025** Notice of Termination to you, you continue to make widespread use of the RODEWAY INN® hotel marks in, around, and in publicity for your hotel. **As of today, you continue to use and display RODEWAY INN® signage at your property, on your Oyorooms.com page, and in your Booking.com listing. Additionally, your Fictious Business Name (FBN) registration for "Rodeway Inn San Clemente" remains active to date, as you have not yet filed the necessary "Statement of Abandonment of Use" with the Orange County Clerk Recorder.**

Included below, for your reference, are screenshots of the infringing hotel signage on your Oyorooms.com page and Booking.com listing, respectively:

**https://www.oyorooms.com/us/259580/?checkin=30%2F06%2F2025&checkout=01%2F07%2F2025&rooms=1&guests=2&rooms_config=1-2_0&selected_rcid=284816**



Mr. Jigna D. Khumbani
July 1, 2025
Page 2

**https://www.booking.com/hotel/us/avenida-san-clemente.html**?



     **Choice demands that you immediately: (1) cease use of any and all Choice owned marks, including but not limited to RODEWAY INN®, and (2) file the necessary paperwork to formally abandon your Fictitious Business Name (FBN) registration of "Rodeway inn San Clemente".** I ask that you respond to Diana Winterson-Russell at **Diana.Russell@ choicehotels.com** no later than _July 14, 2025_, by providing written and photographic evidence that you have removed all RODEWAY INN® hotel service marks on your property signs, supplies, and guest amenities, and stopped identifying the hotel as a RODEWAY INN® hotel to the public in phone greetings, advertisements and online listings and/or third party hotel booking sites such as Google Business Profile, TripAdvisor, Expedia.com and Booking.com. This deadline is not permission to use the marks until that date, nor a reprieve from incurring damages.

     Choice writes this letter without prejudicing or waiving any of its rights, which are hereby expressly reserved.

Sincerely,
CHOICE HOTELS INTERNATIONAL, INC.

_Zachary E. Berge_

Zachary E. Berge
Senior Counsel

cc:    <u>Via email:</u>
       Latrice Gipson, Area Director of Franchise Services
       Michelle Masters, RVP, Franchise Performance

**EXHIBIT 6**



11 December 2025

**Intangible
Asset
Management**

**Hotel Avenida**
**Attn: Jigna D. Kumbhani**
1301 N. El Camino Real
San Clemente, CA 92672

**Jigna D. Kumbhani**
13621 Mica Ave
Victorville, CA 92392
dalsukh@gmail.com

      **Re:**     **Our File No. 20786/30010**; Choice Hotels International, Inc. vs. Hotel Avenida

Dear Mr. Kumbhani:

My name is Matthew Ladenheim and I represent Choice Hotels International, Inc. ("Choice Hotels") in trademark enforcement matters. I write regarding the hotel located at 1301 N El Camino Real, San Clemente, CA 92672 (hereinafter, the "Subject Property"). I understand you were, at one time, a franchisee of Choice Hotels and that you were permitted to operate the hotel at the Subject Property as a ROADWAY INN® branded hotel. Your Franchise Agreement and your right to operate the hotel as a ROADWAY INN® were terminated on April 24, 2025. The Notice of Termination instructed you to immediately cease all use of the ROADWAY® Family of Marks in connection with the provision of hotel services at the Subject Property.

As a former franchisee, you are well aware of the fact that Choice Hotels is the owner of a family of ROADWAY® trademarks for use in connection with the provision of hotel and motel services. Choice Hotels has invested, and continues to invest, significant resources in the development, promotion and protection of the ROADWAY® Family of Marks. As a result of its concerted branding efforts, the marks in the ROADWAY® Family of Marks have become widely associated, in the minds of the consuming and general public, with the goods and services offered by Choice Hotels. The marks in the ROADWAY® Family of Marks are indicative to both the trade industry and consumers that items bearing, or services offered under, the ROADWAY® marks originate from, or are sponsored or approved by, Choice Hotels, and constitute genuine and authentic Choice Hotels goods and services.

You are no longer an authorized franchisee of Choice Hotels. Accordingly, you do not have permission to use any of the marks in the ROADWAY® Family of Marks or any mark confusingly similar thereto in connection with the provision of hotel services. Notwithstanding, it has recently come to my client's attention that you have yet to remove the ROADWAY INN® signage from the Subject Property. An Illustrative photograph depicting your continued use of the ROADWAY INN® trademark appear below:

Matthew J. Ladenheim
IA Director and Founding Partner US – Stobbs



214 W. Tremont Ave,
STE 303, Charlotte,
NC 28203, USA

info@iamstobbs.com
T +1 (704)702 6007

iamstobbs.com



Your continued unauthorized use of the ROADWAY® Family of Marks at the Subject Property constitutes trademark infringement and unfair competition under Federal Law because it creates a likelihood of consumer confusion in the marketplace. 15 U.S.C. §1114, 1125. Consumers familiar with the ROADWAY® Family of Marks are likely to erroneously assume that some connection exists between Choice Hotels and the hotel located at the Subject Property. Trademark infringement is a serious offense and the law provides a number of remedies for infringement which may include preliminary and permanent injunctive relief, money damages, defendant's profits, confiscation and destruction of infringing articles, and, in cases of willful infringement, treble damages and attorney's fees.

For these reasons, Choice Hotels must insist that you immediately discontinue use of the ROADWAY® Family of Marks at the Subject Property. Please provide written and photographic evidence that you have completely discontinued use of the term (both at the Subject Property and online) no later than the close of business Eastern Time on **Friday, December 19, 2025**. This deadline is not permission to use the term until that date, nor a reprieve from incurring damages.

While my client is fully prepared to enforce its intellectual property rights in Federal Court if necessary, it would prefer to resolve this matter on an amicable basis if possible. Accordingly, my client has asked me to reach out to you as a professional courtesy in an effort to open up the lines of communication and hopefully eliminate the need for court intervention. If I do not hear from you or your counsel on or before the close of business Eastern Time on **Friday, December 19, 2025,** I will assume you do not wish to seek an amicable resolution to this dispute and I will advise my client accordingly.

This letter is written without prejudicing or waiving any rights of Choice Hotels, which are hereby expressly reserved. Thanking you for your time and prompt attention to this important legal matter and looking forward to hearing from you soon, I remain

Respectfully,
**STOBBS**

Matthew J. Ladenheim

Matthew J. Ladenheim
IA Director and Founding Partner US – Stobbs

214 W. Tremont Ave,
STE 303, Charlotte,
NC 28203, USA

info@iamstobbs.com
T +1 (704)702 6007

iamstobbs.com



BOARD CERTIFIED SPECIALIST
NORTH CAROLINA STATE BAR
Trademark Law